**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHARLES MICHAEL HEDLUND,
*Petitioner-Appellant*,

v.

CHARLES L. RYAN,
*Respondent-Appellee*.

No. 09-99019

D.C. No.
2:02-cv-00110-DGC

OPINION

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted
December 6, 2012—Pasadena, California

Filed April 24, 2014

Before: Kim McLane Wardlaw, Carlos T. Bea, and N.
Randy Smith, Circuit Judges.

Opinion by Judge N.R. Smith;
Partial Concurrence and Partial Dissent by Judge Wardlaw

# SUMMARY[*]

## Habeas Corpus/Death Penalty

The panel affirmed the district court's denial of a 28 U.S.C. § 2254 habeas corpus petition challenging a conviction and capital sentence for murder.

The panel held that the district court properly denied relief on petitioner's claims regarding (1) the use of a visible leg brace, (2) the use of dual juries for petitioner and his co-defendant, (3) juror bias, (4) ineffective assistance of counsel during the plea process, (5) consideration of mitigating evidence and the use of an unconstitutional causal nexus test under *Lockett v. Ohio*, 438 U.S. 586 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104 (1982), and (6) ineffective assistance of counsel during the penalty phase, because the state court decision denying relief was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts.

Judge Wardlaw concurred in part and dissented in part. She explained that, because the relevant state court decisions addressing petitioner's claim under *Eddings*, and his ineffective assistance of counsel and shackling claims are unreasonable applications of clearly established Supreme Court precedent and include unreasonable factual determinations, she would reverse and remand this appeal.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Paula Kay Harms, Federal Public Defender's Office, Phoenix, Arizona, for Petitioner-Appellant.

Jon Anderson, Arizona Attorney General's Office, Phoenix, Arizona, for Respondent-Appellee.

**OPINION**

N.R. SMITH, Circuit Judge:

Petitioner Charles Michael Hedlund, an Arizona state prisoner, appeals the district court's denial of his 28 U.S.C. § 2254 habeas corpus petition. A jury convicted Hedlund of one count of first degree murder for the 1991 killing of Jim McClain. The trial court sentenced Hedlund to death for the murder. The jury also convicted Hedlund of the second degree murder of Christene Mertens. We affirm the district court and hold that Hedlund has not raised a viable claim for relief under § 2254.

We address six claims raised in Hedlund's petition: (1) the use of a leg brace as a security measure during trial; (2) the use of dual juries; (3) juror bias; (4) counsel's performance during the plea process; (5) whether all mitigating evidence was considered under *Lockett v. Ohio*, 438 U.S. 586 (1978), *Eddings v. Oklahoma*, 455 U.S. 104 (1982), and their progeny; and (6) counsel's performance

during the penalty phase.[1] We conclude that the relevant state court decision underlying each of Hedlund's claims was not contrary to, nor an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts before that court. *See* 28 U.S.C. § 2254(d).

## FACTS AND PROCEDURAL HISTORY

Because the findings of fact in the last reasoned state court decision are entitled to a presumption of correctness, rebuttable only by clear and convincing evidence, we adopt the statement of facts as presented by the Arizona Supreme Court in its 1996 opinion on consolidated direct appeal. *See Runningeagle v. Ryan*, 686 F.3d 758, 763 n.1 (9th Cir. 2012); *Moses v. Payne*, 555 F.3d 742, 746 n.1 (9th Cir. 2008).

> Beginning February 28, 1991, James Erin McKinney and Charles Michael Hedlund (Defendants) commenced a residential burglary spree for the purpose of obtaining cash or property. In the course of their extensive planning for these crimes, McKinney boasted that he would kill anyone who happened to be home during a burglary and Hedlund stated that anyone he found would be beaten in the head.

---

[1] Because Hedlund has not shown that resolution of his remaining claims is "debatable amongst jurists of reason," *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003), we decline to reach the other uncertified issues on appeal. *See* 28 U.S.C. § 2253(c); *Hiivala v. Wood*, 195 F.3d 1098, 1102–04 (9th Cir. 1999) (per curiam).

Defendants enlisted two friends to provide information on good burglary targets and to help with the burglaries. These two friends, Joe Lemon and Chris Morris, were not physically involved in the burglaries in which the murders occurred. It was from Lemon and Morris, however, that Defendants learned that Christene Mertens would make a good burglary target.

The first burglary in the spree occurred on February 28, 1991. Mertens' home was the intended target that night, but she came home and scared the would-be burglars away. A different residence was chosen to burglarize, but Defendants obtained nothing of value. Both Defendants, as well as Lemon and Morris, were involved in this crime.

The second and third burglaries occurred the next night, March 1. This time Lemon was not involved. The three participants stole a .22 revolver, $12, some wheat pennies, a tool belt, and a Rolex watch.

## A.  The first murder

The fourth burglary took place on March 9, 1991. This time only McKinney and Hedlund were involved. Mertens was picked again because Defendants had been told by Lemon and Morris, who knew Mertens' son, that Mertens kept several thousand dollars in an orange juice container in her refrigerator.

Mertens was home alone when Defendants entered the residence and attacked her. Beaten and savagely stabbed, Mertens struggled to save her own life. Ultimately, McKinney held her face down on the floor and shot her in the back of the head, covering his pistol with a pillow to muffle the shot. Defendants then ransacked the house and ultimately stole $120 in cash.

## B.  The second murder

Defendants committed the fifth burglary on March 22, 1991. The target was Jim McClain, a sixty-five-year-old retiree who restored cars for a hobby. McClain was targeted because Hedlund had bought a car from him some months earlier and thought McClain had money at his house. Entry was gained through an open window late at night while McClain was sleeping. Hedlund brought along his .22 rifle, which he had sawed-off to facilitate concealment. Defendants ransacked the front part of the house then moved to the bedroom. While he was sleeping, McClain was shot in the back of the head with Hedlund's rifle. Defendants then ransacked the bedroom, taking a pocket watch and three hand guns; they also stole McClain's car.

*State v. McKinney*, 917 P.2d 1214, 1218–19 (Ariz. 1996) (en banc), *superseded by statute on other grounds as stated in State v. Martinez*, 999 P.2d 795, 806 (Ariz. 2000) (en banc).

Hedlund and McKinney were each indicted on two counts of first degree murder and four other counts relating to the robberies. Both Defendants were tried in the same courtroom before dual juries. Before returning its verdict, Hedlund's jury asked whether he could "be convicted as an accomplice to the burglary and not be convicted in the murder charge." On November 12, 1992, the jury found Hedlund guilty of the second-degree murder of Mertens, the first-degree murder of McClain, and lesser charges. In a special verdict, the jury unanimously found that Hedlund was guilty of the premeditated murder of McClain, rejecting a felony murder theory. The trial court sentenced Hedlund to death for the first degree murder of McClain and to terms of imprisonment on the lesser charges.

Upon direct appeal, the Arizona Supreme Court affirmed the conviction and sentence. *McKinney*, 917 P.2d 1214. In its opinion, the Arizona Supreme Court considered five claims relevant to this appeal: (1) whether the use of dual juries deprived Hedlund of his right to a fair trial, (2) whether ordering Hedlund to wear a visible leg restraint during trial deprived Hedlund of his right to a fair trial, (3) whether Hedlund was denied his right to a fair and impartial jury when the trial court refused to dismiss a juror distantly related to one of the victims, (4) claims surrounding the negotiation of a second plea deal, and (5) the consideration and weighing of aggravating and mitigating factors.

The Arizona Supreme Court denied relief on all claims and noted "ample evidence" that Hedlund killed McClain, including: Hedlund's finger and palm prints were on McClain's briefcase, which had been rifled during the burglary; Hedlund's fingerprints were on the magazine of his sawed-off rifle; the bullet that killed McClain was consistent

with having come from Hedlund's rifle; Hedlund had modified his rifle by sawing it off in order to conceal it; Hedlund hid the rifle after the murder; Hedlund asked Morris to get rid of the rifle before police found it; and Hedlund expressed remorse after he was arrested.

After the Arizona Supreme Court rejected Hedlund's claims, Hedlund filed a petition for post-conviction relief (PCR) and then an amended PCR petition in the state trial court. On PCR review, the trial court denied the amended petition without an evidentiary hearing. The Arizona Supreme Court summarily denied Hedlund's petition for review.

On August 5, 2003, Hedlund filed the operative amended petition for a writ of habeas corpus in federal district court. Hedlund later filed a motion to expand the record and for evidentiary development as to certain claims. On March 31, 2005, the district court denied the motion to expand the record and denied six of Hedlund's claims. On August 10, 2009, the district court denied Hedlund's remaining claims, dismissed the petition, and entered judgment.

The district court granted a certificate of appealability (COA) on three claims. We expand the COA to include three additional claims, as explained below. We otherwise deny Hedlund's request to expand the COA.

## STANDARD OF REVIEW

"We review *de novo* the district court's decision to grant or deny a petition for a writ of habeas corpus." *Rhoades v. Henry*, 598 F.3d 495, 500 (9th Cir. 2010). Because Hedlund initiated district court proceedings in 2002, the Antiterrorism

and Effective Death Penalty Act of 1996 (AEDPA) applies. *See Lindh v. Murphy*, 521 U.S. 320, 336–37 (1997). A petitioner must overcome a high threshold to obtain relief under AEDPA:

> Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision was contrary to federal law then clearly established in the holdings of [the Supreme] Court, § 2254(d)(1); or that it involved an unreasonable application of such law, § 2254(d)(1); or that it was based on an unreasonable determination of the facts in light of the record before the state court, § 2254(d)(2).

*Harrington v. Richter*, — U.S. —, 131 S. Ct. 770, 785 (2011) (internal quotation marks and citation omitted). The "*only* definitive source of clearly established federal law under AEDPA is the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision." *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

If Supreme Court "cases give no clear answer to the question presented, . . . it cannot be said that the state court unreasonably applied clearly established Federal law." *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (internal quotation marks omitted). In other words, "'[i]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme Court].'"

*Harrington*, 131 S. Ct. at 786 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).

In cases where a petitioner identifies clearly established federal law and challenges the state court's application of that law, our task under AEDPA is not to decide whether a state court decision applied the law correctly. *See id.* at 785. Rather, we must decide whether the state court decision applied the law reasonably. *See id.* ("'[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)). If the state court applied the law reasonably, we must deny relief. *See id.* Thus, relief is proper only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." *Id.* at 786.

## DISCUSSION

### I.  Visible Leg Brace at Trial

### A.  Background and procedural history

The trial court ordered both Hedlund and McKinney to wear a leg brace during trial, because it was important to courtroom security. During a pretrial hearing, Deputy Sheriff Jack Roger Lane testified that he was aware of a 1992 escape plot by Hedlund and McKinney. The plan was to "jump one of the guards, take his uniform and his weapon and one of them would put the uniform on and they would walk out together.  They would handcuff the guard and leave him there." Lane received this information third hand from a subordinate officer, who heard it from an inmate. McKinney was specifically identified in the plot. The other individual

was someone "charged with murder," but Hedlund was not specifically named in the discussion on the record.[2] Although Lane could not confirm it, the prosecutor was aware of an earlier escape attempt by McKinney during the summer of 1991.

Hedlund's counsel challenged the leg brace, arguing that McKinney was the flight risk, not Hedlund. Recognizing his responsibility to maintain courtroom security, the trial court found it would be "irresponsible" to ignore the nature of the charges filed and the fact that both Defendants would be in close proximity to the jurors, staff, and others. The court denied the request to remove Hedlund's leg brace, finding "reasonably reliable evidence that there is indeed a real escape risk in this case." The court concluded that the leg brace was "a reasonable alternative to any other type of restraint that could be imposed on [Hedlund and McKinney] to assist in the preservation of a safe environment for everyone [in the courtroom]." The court also attempted to minimize any potential prejudice by making the leg brace less visible. The court ordered new defense tables with backs covering two feet of the four-foot gap between the table top and the floor. The court also ensured that the Defendants would be seated in the courtroom before the juries arrived so

---

[2] When Lane was recalled at a later time, he testified that Hedlund's "jail card" (which tells officers about the risks posed by inmates), contained a narrative about an escape plan. Specifically, the narrative read, "Warning, take keys and clothing per class A1920. McKinney planning escape by jumping guard per information, 300120, per request CPD 2525." While no specific mention of Hedlund was given in this narrative, the escape warning was presumably applied to him as well because the narrative appeared on *Hedlund's* jail card.

the jurors would not see the Defendants walking stiff-legged in the braces.[3]

Hedlund's counsel later filed multiple written motions objecting to the leg brace. During a post-trial evidentiary hearing, the court called Officer Richard Morris, one of the deputies present during trial. Officer Morris testified that during trial he was able to see the leg brace, similar to what was shown in a picture taken from the jury box. Hedlund's investigator testified that she spoke with several jurors regarding the leg brace. The jurors agreed that it was understandable that the Defendants (who had been charged with such serious crimes) were put in some sort of restraint. While the restraints seemed to provide a sense of security to the jurors, the jurors stated that the leg brace did not have any impact on their verdict.

On Hedlund's motion for new trial, after considering the escape risk by two Defendants charged with serious crimes and considering all of the various options (including limiting or increasing the number of deputies in the courtroom), the court concluded that the leg braces were proper to ensure the safety of the jurors, court staff, and everyone in the courtroom. While Hedlund could have helped facilitate concealment of the leg brace, the court noted that the leg brace did not "overwhelm" the jury to cause them to convict Hedlund on all charges.

---

[3] Although the leg restraint was intended to be invisible, the record demonstrates that it was in fact visible to the jury. Indeed, Respondent conceded visibility at oral argument. Insofar as the restraints were visible, however, the trial court found Hedlund largely to blame. In particular, it found that "had [he] chosen to do so, [Hedlund] could have facilitated the concealment of the leg brace by keeping [his] pants pulled down, and [his] legs back from the front of the desk."

On direct appeal, the Arizona Supreme Court credited the trial court's record of security concerns, noting that "Hedlund attempted an escape during the summer of 1991 and also made plans with another capital defendant to escape by attacking a guard and taking his uniform and gun."[4] The court concluded that the leg restraint was not an abuse of discretion, given the trial judge's well-founded security concerns and the absence of specific prejudice to Hedlund.

On habeas review, the federal district court noted that the Arizona Supreme Court erroneously attributed the 1991 escape attempt to Hedlund. However, the district court found no indication, let alone clear and convincing evidence, that the state court erred in finding both Hedlund and McKinney involved in the 1992 escape plot.

**B. Hedlund's leg restraint was not imposed based on a clearly unreasonable determination of the facts, nor was its imposition contrary to, or an unreasonable application of, clearly established federal law**.

**1. Standard of Review**

As an initial matter, Hedlund argues that we should review this claim de novo because the Arizona Supreme Court erroneously attributed McKinney's 1991 escape attempt to Hedlund. While the Arizona Supreme Court's recitation of that fact is in error, as the federal district court correctly recognized, there is no indication that the trial court or the Arizona Supreme Court on direct review erred in

---

[4] As fully discussed below, this recitation of the facts is in error. The record shows that it was *McKinney*, not Hedlund, who attempted an escape in 1991.

concluding that Hedlund was involved in the 1992 escape plot with McKinney. The trial court presumed that Hedlund was the other capital inmate plotting an escape with McKinney in 1992. Hedlund has not shown that this presumption was an unreasonable determination of the facts. Nor has he rebutted this factual determination with clear and convincing evidence.

Deputy Lane testified that an inmate (who knew McKinney) overheard McKinney plotting with another capital defendant. While the inmate-informant did not know Hedlund by name, jail security personnel drew the inference that the unnamed capital defendant was Hedlund. Jail security personnel then acted upon this tip by noting the security risk on Hedlund's jail card. Thus, when the Arizona Supreme Court stated that Hedlund made plans with another capital defendant (i.e., McKinney) to escape, this was neither factually erroneous nor objectively unreasonable based on Deputy Lane's testimony.[5]

### 2. An essential state interest justified the leg restraint.

The Arizona Supreme Court's decision affirming the use of the leg brace was not contrary to, or an unreasonable application of, clearly established federal law. Ordering the leg brace was justified by an essential state interest. The Supreme Court has defined shackling as "the sort of inherently prejudicial practice that . . . should be permitted

---

[5] Even if we assume that the Arizona Supreme Court's erroneous factual statement (mis-attributing the 1991 escape attempt to Hedlund) is enough to call into question the entirety of the factual findings regarding shackling, conducting de novo review would not change the outcome.

*only* where justified by an essential state interest specific to each trial."**[6]** *Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986) (emphasis added). This determination turns on the facts of the case. Where an obstreperous defendant's actions threaten the proceedings, even fully binding and gagging the defendant could be constitutionally permissible. *Illinois v. Allen*, 397 U.S. 337, 344 (1970).

Here, the trial court found that Hedlund posed a security risk, thus warranting the minimally intrusive restraint. The trial court based this finding on the alleged 1992 escape plot involving both Defendants, the nature of the charges, and the safety of all persons in the courtroom during trial. The trial court's conclusion, that specific security interests presented by the facts of this case warranted the leg restraint, cannot be said to be contrary to, or an unreasonable application of, *Holbrook* (i.e., whether an essential state interest justified the use of a leg brace in this case). *Holbrook*, 475 U.S. at 569. *See also Hamilton v. Vasquez*, 882 F.2d 1469, 1471 (9th Cir. 1989) ("Shackling is proper where there is a serious threat of escape or danger to those in and around the courtroom, or

---

**[6]** Where the decision to physically restrain a defendant violates due process, on habeas review, a petitioner must show that the error had "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (internal quotation marks omitted). "To determine whether the imposition of physical restraints constitutes prejudicial error, we have considered the *appearance and visibility* of the restraining device, the nature of the crime with which the defendant was charged and the strength of the state's evidence against the defendant." *Larson v. Palmateer*, 515 F.3d 1057, 1064 (9th Cir. 2008) (emphasis added). However, we have also recognized that this multi-factor test is not clearly established federal law. *Walker v. Martel*, 709 F.3d 925, 938 (9th Cir. 2013). In any event, because we find that the use of a leg restraint did not violate due process, we do not reach the issue of prejudice.

where disruption in the courtroom is likely if the defendant is not restrained."); *Crittenden v. Ayers*, 624 F.3d 943, 971 (9th Cir. 2010) (defendant failed to rebut "by clear and convincing evidence the trial court's finding on the record that the restraints were justified by a state interest specific to Crittenden's trial, namely his likelihood of escape or 'nonconforming conduct.'").

The record shows that jail personnel became aware of the 1992 escape plan after a tip from another inmate. While the inmate knew McKinney's name, the inmate knew only that the co-plotter was another inmate charged with capital murder. Jail personnel then reviewed and acted upon this information. We do not know how jail personnel made the inference that the second inmate was Hedlund (e.g., whether Hedlund was the only other capital murder defendant who had been talking to McKinney, or was the only capital murder defendant housed in close proximity to McKinney). However, we do know that, after learning of the plot, jail personnel applied special security procedures to both Defendants and provided this information to the trial court.

While the trial court based its conclusion regarding the escape plot on information provided by jail personnel, the trial court's reliance on this testimony was not contrary to, or an unreasonable application of, clearly established federal law. The trial court could have used the jail's security-based decision as support for its conclusion that Hedlund posed an escape risk, because such decisions are subjective and discretionary. *Cf. Rhodes v. Chapman*, 452 U.S. 337, 350 n.14 (1981) ("[A] prison's internal security is peculiarly a matter normally left to the discretion of prison administrators.").

The trial court relied on Deputy Lane's assertion and concluded as follows:

> I have been provided with what I have weighed and considered as reasonably reliable evidence that there is indeed a real escape risk in this case; perhaps not in the courtroom, but one that has been articulated outside the hearing of the Court in a fashion that indicates that both defendants were anticipated to be involved in it. . . . [There was] certainly some thought being given on the nature and mode of escape.

Although the trial court based this decision on hearsay coming from within the jail, there is no clearly established federal law suggesting that such a finding is impermissible. Challenging the trial court's reliance upon such hearsay, Hedlund cites *Gonzalez v. Pliler*, 341 F.3d 897, 902 (9th Cir. 2003). However, *Gonzalez* is inapplicable to this case. First, *Gonzalez* applies the "less restrictive alternatives" test that was not clearly established federal law for AEDPA purposes. *See Crittenden*, 624 F.3d at 971–72 (recognizing that "case law requiring a court to weigh the benefits and burdens of shackling and pursue less restrictive alternatives was not clearly established federal law" before *Deck v. Missouri*, 544 U.S. 622 (2005)). Second, while *Gonzalez* recognized that the rules regarding physical restraints in California and the Ninth Circuit are largely coextensive, *id.* at 902 n.1, the language stating that a court may not rely upon "the

unsubstantiated comments of others" is drawn from California precedent, not clearly established federal law, *id.* at 902 (quoting *People v. Mar*, 52 P.3d 95, 107 (Cal. 2002)).

It was not objectively unreasonable for the Arizona Supreme Court to find an essential state interest based on Lane's testimony regarding the 1992 Hedlund/McKinney escape attempt. Therefore, upholding the decision to impose the leg brace was not contrary to, or an unreasonable application of, clearly established federal law.

### 3. Prejudice

Because the Arizona Supreme Court's adoption of the finding that Hedlund's leg brace was justified by an essential state interest is not contrary to, or an unreasonable application of, *Holbrook*, we do not reach the question of prejudice.

## II. Use of Dual Juries

### A. Background and procedural history

Over the Defendants' and prosecutor's objections, the trial court ordered the Defendants' cases tried before dual juries. The trial court reasoned that two trials would cause needless duplication, the victims' families would suffer twice, and the only evidence that was not admissible to both juries

could be covered in a single afternoon.[7]  The court set forth detailed procedures to be used at trial to avoid any problems.[8]

Hedlund challenged the use of dual juries in a special action to the Arizona Court of Appeals.  *See Hedlund v. Sheldon*, 840 P.2d 1008, 1009 (Ariz. Ct. App. 1992).  The court of appeals reversed, holding that the trial court exceeded its authority under the Arizona Rules of Criminal Procedure and the Arizona Supreme Court's decision in *State v. Lambright*.  *Id.*  However, the Arizona Supreme Court

---

[7] The court arranged for this evidence to be heard separately to avoid a possible *Bruton v. United States*, 391 U.S. 123 (1968), violation.  In *Bruton*, during a joint trial, the trial court instructed the jury that a codefendant's confession inculpating both the codefendant and the defendant could be used only against the codefendant, and should be disregarded with respect to the defendant. 391 U.S. at 124–25.  Where the jury was allowed to consider the codefendant's confession, the Supreme Court found that the confession "added substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination, since [the codefendant] did not take the stand.  [The defendant] thus was denied his constitutional right of confrontation."  *Id.* at 128.  The Court recognized that "[t]he unreliability of [inculpatory statements by a codefendant] is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination."  *Id.* at 136.  The Court concluded that "in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination."  *Id.* at 137.

[8] Those procedures included separate voir dire of the jury panels, a courtroom layout that allowed both Defendants full view of the jurors and witnesses, separate preliminary instructions, separate opening statements, separate reading of the charges, special procedures for handling codefendant inculpatory statements, separate closing statements, and special procedures for the return of the verdicts.

reversed the court of appeals,[9] concluding that the decision to empanel a dual jury is an "exercise of an individual judge's discretion to use a particular technique in order to meet a specific problem in a single case." *Id.* at 1011 (internal quotation marks omitted). Thus, the court affirmed the decision to impanel dual juries.

Post-trial, the trial court rejected Hedlund's renewed dual jury challenge. The court found that it had eliminated the risk of possible prejudice by empaneling dual juries rather than having one jury consider both Defendants' guilt. The court concluded that this strategy worked, because the verdicts reflected that the juries were able to do their jobs intelligently.

**B. The use of dual juries at trial was not contrary to, or an unreasonable application of, clearly established federal law.**

Because Hedlund cannot point to clearly established federal law governing this claim, habeas relief is unavailable. The Supreme Court has not spoken on the issue of dual juries, and Hedlund cites no relevant authority.

In *Zafiro v. United States*, 506 U.S. 534, 538–39 (1993), the Court held that severance is not required in the face of antagonistic defenses. Even where prejudice is shown, Rule 14 of the Federal Rules of Criminal Procedure "leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Id.* The Court went on to say that

---

[9] At the same time, the supreme court also reversed its earlier decision in *State v. Lambright*, 673 P.2d 1 (Ariz. 1983), *cert. denied*, 469 U.S. 892 (1984), which had found that the use of dual juries violated state law.

severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539.

Hedlund argues that this claim is valid, because certain of his specific trial rights were violated. While *Zafiro* holds that severance should be granted if there were a serious risk that a specific trial right would be compromised, *Zafiro* does not apply to § 2254 cases. *Zafiro* was a direct-appeal case originating in federal district court (i.e., a case in which the Federal Rules of Criminal Procedure applied). *See Collins v. Runnels*, 603 F.3d 1127, 1131–32 (9th Cir. 2010) ("By its own wording, *Zafiro* only applies to federal and not state court trials. It analyzes only the *Federal* Rules of Criminal Procedure applicable to federal district courts."), *cert. denied*, 131 S. Ct. 243 (2010).

Even if we could apply *Zafiro*'s prejudice holding, Hedlund has not identified any specific constitutional right that has been violated. While he alludes to several constitutional violations, none of these arguments is well developed with citation to authority. To the extent Hedlund argues that the prosecutor was improperly allowed to ask leading questions or elicit ambiguous testimony, he does not cite specific examples. Moreover, defense counsel had the opportunity to object at trial and did so. Although some objections were overruled, it is not clear the subject questions were leading or ambiguous, and if so, whether these evidentiary rulings were improper or harmed Hedlund in any way.

Even if ambiguous testimony or leading questions could somehow amount to a constitutional violation, the testimony

did not prevent Hedlund from demonstrating lack of motive or putting on a full defense. The jury heard testimony that Hedlund had a steady job and did not need to steal for money, and Lemon and Morris testified that Hedlund wanted nothing to do with the early burglaries.

Hedlund's antagonistic defenses argument similarly fails. There is no constitutional right to severance merely because codefendants point the finger at each other. Moreover, the trial court's remedy of employing procedural safeguards for the use of dual juries was within its discretion. Because none of Hedlund's dual jury arguments demonstrate prejudice that is so "clear, manifest or undue that he was denied a fair trial," even if *Zafiro* applied, this claim fails. *See Lambright v. Stewart*, 191 F.3d 1181, 1185–87 (9th Cir. 1999) (dual juries are permissible in capital cases so long as they comport with Due Process; denial of a motion to sever for antagonistic defenses not reversible without a showing of clear prejudice).

## III.  Juror Bias

### A.  Background and procedural history

On the second day of trial, one juror ("the Juror") wrote a letter to the trial court disclosing the fact that she discovered she was distantly related to McClain, the second murder victim. In the letter, the Juror explained that she had become aware of this fact only that morning. When the Juror informed her mother she was serving on a jury, her mother stated that "she had read of a trial starting in Mesa in which one of the victims had been married to a cousin of [the juror's] stepfather." The Juror told her mother she could not discuss the trial and did not want to hear anything further. However, the Juror realized she would have to disclose this

to the judge, so she asked her mother the name of the victim who was married to the stepfather's cousin. The Juror stated that she didn't personally recognize the name of the victim and had "never met, nor even heard of, [her] stepfather's cousin, who is deceased." She then concluded with the following statement regarding her ability to serve on the jury: "I don't believe it would affect my ability to be fair and impartial, but I do not wish to compromise the proceedings in any way, so I wish to make the court aware of the situation."

In response to the letter, the trial court held a hearing in chambers to explore whether the Juror should remain on the jury. The court read the Juror's statement about impartiality back to her and asked if this were her belief. She responded, "Yes, it is." In response to the court's questions, the Juror explained that she had never met her stepfather's now deceased cousin who used to be married to McClain. In fact, until the conversation with her mother, she didn't even know the cousin existed. Hedlund's counsel inquired about the Juror's relationship with her stepfather. The Juror explained that they "have a very superficial relationship."

Hedlund's counsel moved to strike the Juror for cause on the basis that she was a distant relative of the victim. The court stated, "given what she said here today I would not, based on what I've heard . . . have stricken her for cause. . . . She is now on the jury. And based on the circumstances she has relayed to me, I'm going to deny the motion. She'll remain on the panel."

On appeal, the Arizona Supreme Court affirmed, finding that nothing in the record suggested the Juror was untruthful in stating she could be fair and impartial. The federal district court agreed. The district court found no risk of "substantial

emotional involvement based on [the Juror's] highly attenuated connection with the victim, about which the [J]uror was not even aware . . . ."

## B. The trial court complied with clearly established federal law when it determined no juror bias was present.

### 1. Hedlund has failed to prove actual bias.

Because the trial court followed clearly established federal law regarding actual juror bias, Hedlund's claim fails on this theory. In *Remmer v. United States*, the Supreme Court held that juror bias should be determined "in a hearing with all interested parties permitted to participate." 347 U.S. 227, 229–30 (1954). In *Smith v. Phillips*, the Supreme Court reversed a grant of habeas where the lower federal courts found insufficient a hearing to determine juror bias. 455 U.S. 209, 214–16, 221 (1982). During the *Smith* trial, one of the jurors applied for a job as an investigator with the DA's office. *Id.* at 212. The prosecutors were aware of the application, but did not tell the court or defense counsel until after the jury returned its verdict. *Id.* at 212–13. Upon learning of the juror's job application, the defendant moved to set aside the verdict. *Id.* at 213. The trial court held a hearing on this motion, at which both the prosecutors and the juror testified. *Id.* After the hearing, the trial court found that the juror was not biased as a result of his job application to the DA; and no evidence suggested a "sinister or dishonest motive" on the prosecutors' part. *Id.* at 214. On habeas appeal, the federal district court found the trial court's bias hearing insufficient and granted relief, which the Second Circuit affirmed.

The Supreme Court reversed the lower federal courts, finding that the trial court's hearing (exploring the issue of juror bias) was sufficient to comply with due process. *Id.* at 221. The Court reiterated that it "has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Id.* at 215. The Court rejected the argument that a trial court "cannot possibly ascertain the impartiality of a juror by relying solely upon the testimony of the juror in question." *Id.* The Court disagreed that "the law must impute bias to jurors" in this situation. *Id.* Rather than ordering a new trial any time the issue of juror bias arises, the Court explained that holding a hearing to determine actual bias, such as that conducted by the trial court, is the appropriate course of action. *Id.* at 217.

The *Smith* court concluded:

> [D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as *voir dire* and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at

a hearing like that ordered in *Remmer* and
held in this case.

*Id.* (footnote omitted).

The Court recognized that hearings of this sort will
"frequently turn upon testimony of the juror in question," but
rejected the contention that "such evidence is inherently
suspect." *Id.* at 217 n.7. When a juror tries "as an honest
man to live up to the sanctity of his oath[, the juror] is well
qualified to say whether he has an unbiased mind in a certain
matter." *Id.* Lastly, the Court reiterated that, because this
case was a § 2254 proceeding, the trial judge's findings are
"presumptively correct" and cannot be overcome without
clear and convincing evidence. *Id.* at 218.

The Arizona Supreme Court's finding that the trial court
did not abuse its discretion in refusing to dismiss the Juror
was not contrary to, nor an unreasonable application of, *Smith*
and *Remmer*. The trial judge conducted a hearing involving
all interested parties to explore the issue of juror bias. At this
hearing, Hedlund had the opportunity to prove actual bias.
This is the remedy prescribed by the Supreme Court. *Smith*,
455 U.S. at 215.

Hedlund challenges the sufficiency of the in-chambers
hearing, arguing that the hearing was cursory, defense
counsel was not given time to prepare, and it was the judge's
duty to question the Juror sufficiently. Hedlund argues that
defense counsel could not be expected to conduct a vigorous
cross-examination that might place Hedlund in a negative
light. However, *Smith* does not dictate that an in-chambers
hearing is insufficient, must be of a particular length, or must
be conducted only after certain notice. *Id.*; *see also Dyer v.*

*Calderon*, 151 F.3d 970, 974–75 (9th Cir. 1998) ("An informal in camera hearing may be adequate for this purpose; due process requires only that all parties be represented, and that the investigation be reasonably calculated to resolve the doubts raised about the juror's impartiality."). Here, the trial court questioned the Juror about her ability to be impartial, it did not rush defense counsel as counsel familiarized himself with the Juror's letter, and it followed up with additional questions. Based on the Juror's responses that she was unaware of both her stepfather's now-deceased cousin and the victim, her relationship with her stepfather was superficial, and her belief was that she could remain impartial, the court was satisfied that no actual bias was present. As the Ninth Circuit explained in *Calderon*: "So long as the fact-finding process is objective and reasonably explores the issues presented, the state trial judge's findings based on that investigation are entitled to a presumption of correctness." *Id.* at 975. Thus, the court complied with clearly established federal law.

Although the Juror stated that she "believed" she could be impartial, she did not equivocate and the judge found this affirmation sufficient. Hedlund points to no authority requiring more of an assurance from the Juror. *See Bashor v. Risley*, 730 F.2d 1228, 1237 (9th Cir. 1984) (no error in keeping juror when juror responded to question of whether she could be impartial with "Yes, I think I could.").[10]

---

[10] Citing *United States v. Gonzalez*, 214 F.3d 1109, 1114 (9th Cir. 2000), Hedlund argues that the Juror's statement was "somewhat equivocal." In *Gonzalez*, the Ninth Circuit noted the difference between a juror who is somewhat indirect in their responses (Q: Would your husband's experience keep you from serving impartially? A: "I don't believe so, no."; Q: Could you set aside your feelings and act impartially? A: "I believe so, yes."), and a juror who answers equivocally three times in a

### 2. There is no clearly established law governing implied bias, and Hedlund has not shown that implied bias should apply here.

There is no clearly established federal law regarding the issue of implied bias. The Supreme Court has never explicitly adopted or rejected the doctrine of implied bias. *See Fields v. Woodford*, 309 F.3d 1095, 1104 (9th Cir. 2002) (noting the fact that the "Supreme Court has never explicitly adopted (or rejected) the doctrine of implied bias"), *amended on other grounds*, 315 F.3d 1062 (9th Cir. 2002). Thus, Hedlund's claim fails on grounds of implied bias.[11]

---

row to whether she could be fair ("I will try to"; "Right. I'll try"; and "I'll try"). *Id.* The court recognized that it would be acceptable to retain the first juror, because after stating her belief, the juror followed up with "an unqualified affirmative or negative" regarding impartiality. *Id.* The same can be said for the Juror. In her letter, she initially stated "I don't believe it would affect my ability to be fair and impartial," then when questioned by the trial court, she added "an unqualified affirmative" when she was asked to confirm her belief that she could be impartial (Q: "You state here at the end that, 'I don't believe it would affect my ability to be fair and impartial.' Is that your belief?" A: "Yes, it is."). While the trial court asked the question somewhat inartfully, the Juror's response does not display equivocation. Moreover, the trial court credited her response after asking further questions, observing her demeanor, and judging her credibility. This finding is entitled to a presumption of correctness. *Rushen*, 464 U.S. at 120.

[11] Although not controlling, Justice O'Connor's concurrence in *Smith* expressed concern about cases involving juror misconduct. Therein, she listed certain "extreme situations" in which she believed a bias hearing may be inadequate and implied bias could be found. Examples may include: "a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a *close* relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." *Smith*, 455 U.S. at 222 (O'Connor, J., concurring) (emphasis added). Because

Although the Ninth Circuit has presumed bias on a rare occasion, it has based this finding on close relationships or the fact that a juror has lied. *See, e.g.*, *United States v. Allsup*, 566 F.2d 68, 71–72 (9th Cir. 1977) (bias of bank teller employees presumed where defendant robbed another branch of same bank and tellers had "reasonable apprehension of violence by bank robbers"); *Green v. White*, 232 F.3d 671, 676–78 (9th Cir. 2000) (presuming bias biased on juror's pattern of lies). However, these cases are not clearly established federal law. In any event, nothing in the record suggests the Juror lied during voir dire or had a close relationship with McClain.

---

she read the majority opinion as not foreclosing the use of implied bias in certain situations, Justice O'Connor concurred. *Id.* at 224.

Even if this concurrence could be construed as clearly established federal law, the notion that implied bias could be found when a juror is a *close* relative does not lead to the conclusion that implied bias should be found when the juror is a former distant relative by virtue of two marriages, one now dissolved and the former relative now deceased. Moreover, Hedlund does not allege juror misconduct in this case. The Juror was forthcoming as soon as she found out about the former relation and there is no indication she tried to conceal bias to influence the outcome of the trial.

## IV. Ineffective Assistance of Counsel during Plea Process[12]

### A. Background and procedural history

Before trial, Hedlund reached a plea deal with the prosecutor. During an informal chambers discussion, defense counsel and the prosecutor were asked to explain the factual basis for the plea, which offered a guilty plea for the second degree murder of Mertens and theft with a prior for taking McClain's guns. The trial court rejected the plea agreement, because it did not involve enough accountability for the McClain homicide. The court suggested a plea involving a burglary count with respect to McClain could be considered. However, as discussed below, the court had other reservations with respect to this and any future plea agreement. The parties continued negotiating and reportedly arrived at a second agreement consisting of a guilty plea for the second degree murder of Mertens, and theft with a prior and burglary non-dangerous with respect to McClain.

On the day the second plea was to be presented in chambers, Hedlund's counsel instead called chambers and asked the judge if he would recuse himself. When the judge responded that he would not, Hedlund filed a motion for recusal of judge, followed by a motion for change of judge. A second judge heard the latter motion. The motion made clear that Hedlund wanted to plead guilty to the new plea agreement, but that he refused to do so in front of the trial

---

[12] The district court declined to grant a COA on this issue. However, because we conclude that the district court's resolution of the issue is "debatable amongst jurists of reason," *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003), we address it.

judge, Judge Sheldon. The second judge denied the motion and trial began immediately. The substance of the motion hearing is discussed below in the context of the ineffective assistance of counsel analysis.

On appeal, the Arizona Supreme Court questioned whether a second plea was ever reached. The court also noted that the prosecutor's testimony at the hearing on the change-of-judge motion was that Hedlund in fact rejected the second plea. Thus, the court rejected the claim that the trial court erred in any way with respect to the purported second plea. The claim challenging counsel's performance was similarly rejected on PCR review.

## B. The state PCR court did not unreasonably apply *Strickland*.

The two-part test for demonstrating ineffective assistance of counsel, set forth in *Strickland v. Washington*, 466 U.S. 688 (1984), is also "applicable to ineffective-assistance claims arising out of the plea process." *Hill v. Lockhart*, 474 U.S. 52, 57 (1985). We must first ask whether "counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. Counsel must have "wide latitude . . . in making tactical decisions," and "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* In the context of that presumption, we "must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690.

Second, if counsel's performance were deficient, we assess prejudice. Prejudice "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill*, 474 U.S. at 59. "In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* (footnote omitted).

Under AEDPA, review of the state court's application of *Strickland* is "doubly deferential" to the performance of counsel, because a petitioner must show that the state court's ruling was an objectively unreasonable application of *Strickland*. 28 U.S.C. § 2254(d)(1); *see also Bell v. Cone*, 535 U.S. 685, 698–99 (2002); *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009).

1. **It was not objectively unreasonable for the state PCR court to conclude that counsel's performance was not deficient.**

The state court did not unreasonably apply *Strickland*. Because Hedlund has not shown that his counsel performed deficiently in making the tactical decision to attempt to move Hedlund's plea proceedings before a different judge, relief is unavailable. Hedlund's arguments that counsel failed to present the second plea in a timely manner and that there was a reasonable probability that the trial judge would have accepted that plea are not supported by the record.[13]

---

[13] As an initial matter, it is not clear that the second offer was still valid at the time in question. According to the prosecutor, Hedlund rejected the second plea offer two days before defense counsel called chambers and asked the judge to recuse himself.

First, on the day both counsel were supposed to appear in chambers to discuss the second plea agreement, Hedlund's counsel called the court to ask informally whether the judge would recuse himself. Counsel explained that "Mr. Hedlund would be willing to enter into a plea agreement but not in front of Judge Sheldon." The judge's assistant responded that the judge would not recuse himself and since counsel did not appear that day as required, the court would no longer entertain further plea agreements. Based on Judge Sheldon's response, Hedlund's counsel filed a motion for change of judge for cause in which he challenged "the bias exhibited by the court with regard to Mr. Hedlund." In the motion, counsel explained:

> Hedlund is willing to enter into [the second] plea agreement in any court other than this court. Defendant Hedlund feels that this court has become biased against him. He feels that he will not be offered a realistic opportunity to persuade this court at the time of sentencing that any sentence other than the maximum consecutive sentence is appropriate. This feeling is based, in part, on the court's sua sponte decision to empanel dual juries, the denial of all substantive pretrial motions filed by the defense and the court's demeanor leading up to trial. . . . The court's failure to recuse itself would be tantamount to forcing the death penalty upon defendant Hedlund. As the court is aware, there is a significant amount of evidence against Mr. Hedlund in these cases. It is Mr. Hedlund's purpose to avoid the death peanlty in this case.

At the motion hearing before another judge, Judge Sheldon testified regarding his concerns with the first plea agreement and the fact that a second plea agreement was never formally offered. When Hedlund's counsel examined Judge Sheldon, Judge Sheldon also explained that (1) he was concerned about the plea being commensurate with culpability, (2) he took into account victim letters received from McClain's family, and (3) continuing the plea process when a plausible plea was not on the table would only waste time and thwart the arrangements for a single trial with dual juries.

In his closing remarks, defense counsel argued why he thought Judge Sheldon was biased and why it would result in an unfair trial for Hedlund. With respect to the plea process, counsel highlighted the fact that Hedlund refused to plead before Judge Sheldon. Specifically, counsel stated that Hedlund

> would be willing to enter into a plea but not in front of that Court [Judge Sheldon]. He would be willing to enter it in front of any other Court and this is again, a plea Judge Sheldon would most likely have been amenable to, but Mr. Hedlund felt he would not get a fair shake and still the Court said, no, we will not recuse ourselves so let justice be done.

Counsel concluded with an impassioned argument about the justice system and the importance of maintaining the community perception of fairness to victims and defendants alike. Counsel pleaded he was not asking for a handout, but "[w]hat he [was] asking on behalf of [Hedlund] is fairness,

the ability to be heard before a Court without the appearance of impropriety."

In rebuttal, counsel argued that, when you put all of the things Judge Sheldon did together, "it is enough for [Hedlund] and I to believe for the community to say, hold it, he is not getting a fair shake. There is the appearance of impropriety in reading those [victim] letters at that time and not giving him the benefit of a presentence report." Counsel argued that the letters were not merely victim letters, but ex parte communications from state witnesses who also happened to be victims. Counsel reiterated that rejection of the plea to facilitate moving forward with the dual jury procedure was also improper.

This record demonstrates that counsel's motion to have Hedlund's case moved before a different judge was purely a tactical decision.[14] Counsel apparently honestly believed that Hedlund could not get a "fair shake" in front of Judge Sheldon. Even though counsel believed Judge Sheldon was likely to accept the second plea, counsel persisted with the request. He persisted, because he thought Hedlund faced an undue risk of bias and would surely receive a death sentence from Judge Sheldon if the second plea agreement were not accepted and the case proceeded to trial. Counsel's written motion and arguments made clear that it was Hedlund's primary goal at this point to avoid the death penalty. We must give deference to counsel's tactical decision to do whatever he could to put his client in front of a non-biased judge (who was not pre-inclined to sentence Hedlund to

---

[14] With respect to preserving the plea in the record, counsel set forth the terms of the plea in his written motion and explained the terms of the plea at the motion hearing.

death).  It was not error for the state PCR court to conclude
that counsel's performance was not deficient.    Indeed,
counsel made strong arguments about the judge having ex
parte communication with the state's witnesses (who were
also victims) and gave many reasons for wanting the case
moved before another judge.

Hedlund's and the dissent's argument that counsel missed
the deadline for the second plea agreement is a red herring.
At base, this argument again challenges counsel's tactical
decision.   On the day defense counsel and the prosecutor
were supposed to appear in chambers to discuss the second
plea agreement, counsel instead put the wheels of recusal in
motion.[15]  He called chambers requesting recusal.  When the
judge declined, he proceeded with a formal motion to have
the recusal motion heard before another judge so that the plea
process could continue in front of an unbiased jurist and
without the dual jury deadline hanging over his head.  This
too was a tactical decision; it was not an act of incompetency.

---

[15] The dissent criticizes defense counsel's failure to pursue
simultaneously the plea negotiations before Judge Sheldon and the recusal
motion.  However, this criticism ignores defense counsel's rationale in
seeking recusal.

In his motion to recuse, defense counsel stated that "Hedlund and the
State have come to a [sic] agreement which is within the range suggested
by the court"  and that "Hedlund is willing to enter into this plea
agreement *in any other court than this court*."  (emphasis added).  Having
procured a tentative plea agreement that would allow Hedlund to avoid
death, defense counsel decided to withdraw from plea negotiations before
Judge Sheldon (where Hedlund *refused* to enter the plea agreement) and
tried to move the plea negotiations to another court (where Hedlund *would*
enter the plea agreement).  Defense counsel's decision not to pursue plea
negotiations in a court where his client refused to enter a plea agreement
does not fall below *Strickland*'s deferential standard.

Because counsel's performance did not fall outside of the wide range of professionally competent advice, the state courts did not unreasonably apply the first prong of *Strickland*.

## 2. No prejudice has been shown.

Even assuming the state PCR's court's application of *Strickland* was objectively unreasonable, Hedlund has not shown a reasonable probability that, but for counsel's errors, Hedlund would not have gone to trial. In other words, the record does not demonstrate that, if counsel would have presented the second plea agreement to Judge Sheldon (instead of calling chambers to ask for recusal), there is a reasonable probability Judge Sheldon would have accepted the agreement and Hedlund would have avoided the death penalty. *See Lafler v. Cooper*, 132 S. Ct. 1376, 1385 (2012) ("In these circumstances a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court . . . , that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.").

Although Hedlund argues that the second plea with respect to the McClain homicide would have complied with the range of acceptable penalties to which the trial court would have agreed, it is unlikely that the court would have accepted the plea as to either the Mertens *or* the McClain crimes.

First, with respect to the McClain homicide, while Judge Sheldon had indicated that first degree burglary would be a

starting point, "[a]t that point, [Judge Sheldon] had not made up [his] mind whether or not that would be an appropriate disposition because [he] still . . . continued to have serious reservations about the disposition of this case given the charges against [Hedlund] . . . ." Judge Sheldon testified with respect to the first plea agreement, "Quite frankly, I was very surprised there had not been a plea to First Degree Murder with the State stipulating it would not seek the death penalty, and I was surprised there had been a plea to Second Degree Murder and I think from what I gathered in [defense counsel's] conversations, that [counsel] shared my reservations about being able to establish a factual basis for Second Degree Murder to a Felony Murder charge because the law is quite clear, there are no lesser included offenses to Felony Murder." Based on the court's statements, this plea would not have provided sufficient accountability for the McClain homicide. There is nothing else in the record suggesting a reasonable probability that the court would have accepted the new offer of a plea to theft with a prior and burglary non-dangerous with respect to McClain.

Second, with respect to Mertens, during the hearing on the change-of-judge motion, Judge Sheldon testified that, after reviewing the first plea agreement, he "continue[d] to have reservations about [the second degree murder plea for the Mertens homicide] and as I indicated to [defense counsel], at the conclusion of that hearing, that I was – [defense counsel] had indicated to me apparently [he] and [the prosecutor] were going to continue plea negotiations or try and work something out." Judge Sheldon further testified that he "continued to have reservations as you all did in stating to me you weren't sure whether or not a plea to Second Degree Murder, you would be able to establish a factual basis, so there were reservations . . . between all

parties at that point." With respect to the first plea agreement, even after the parties recited a factual basis for second degree murder, the court's concerns "were not dispelled" as to whether the plea could be accepted for the Mertens homicide. Again, there is nothing in the record to suggest that the court's concerns would have been dispelled such that it would have accepted the second plea agreement's identical offer of second degree murder for the Mertens crime.

Third, Judge Sheldon expressed concern about "disparate treatment given to . . . co-defendants" and whether this would create due process concerns under existing Supreme Court precedent. Judge Sheldon also explained that, if it turned out Hedlund was just as culpable or more culpable than McKinney, he would have been allowed less severe punishment under the plea agreement while McKinney faced the death penalty. Counsel was given the opportunity to explain during the informal plea discussion how Hedlund was less culpable than McKinney, but the judge "simply did not hear it."

In sum, Judge Sheldon expressed (1) ongoing reservations about even accepting a second degree murder plea for the Mertens homicide, (2) concern that the plea reflect the appropriate amount of culpability for the McClain homicide (given the strong evidence against Hedlund), and (3) a desire to avoid disparate sentences. Moreover, the record indicates that Hedlund was not willing to enter a plea agreement in front of Judge Sheldon. When defense counsel called Judge Sheldon's chambers asking the judge to recuse himself, the explanation defense counsel provided was that "Hedlund would be willing to enter into a plea agreement but not in front of Judge Sheldon." He provided the same explanation

in his motion to recuse.[16]　On this record, it cannot be said that, if Hedlund's counsel had presented the second plea to Judge Sheldon, there is a reasonable probability it would have been accepted and the death penalty avoided.　Thus, Hedlund has failed to show prejudice.

## V.  Consideration of Mitigating Evidence under *Lockett/Eddings*[17]

## A.  Background and procedural history

During the penalty phase of trial, the trial court found evidence of Hedlund's tortured childhood to be compelling and credible.　However, the court found that the mitigating factors of Hedlund's childhood abuse and long-term alcohol use did not outweigh aggravating factors.　The court reached this conclusion because, at the time of the crime, these factors did not affect Hedlund's behavior or prevent him from knowing right from wrong.　The trial court thus sentenced Hedlund to death.

When the Arizona Supreme Court conducted an independent review of the mitigating factors, it struck one of Hedlund's aggravating factors and reweighed the remaining aggravating factor against the mitigating evidence.　The

---

[16] These portions of the record belie the dissent's contention that "there is no evidence in the record that Hedlund himself did not want to enter a plea in front of Judge Sheldon."

[17] The district court declined to grant a COA on this issue.　However, because we conclude that the district court's resolution of the issue is "debatable amongst jurists of reason," *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003), we address it.

supreme court then found that the aggravating factor was not overcome.

The federal district court also found that Hedlund's trial court fulfilled its duty to consider all of the mitigating evidence and that it did not impose a relevancy test "or any other barrier" to consideration of this evidence. The district court concluded that no constitutional error arose when the trial court assigned less weight to the family-background and alcohol mitigating evidence because it did not influence Hedlund's criminal conduct.

## B. The Arizona Supreme Court properly applied *Lockett*, *Eddings*, and their progeny.

In *Lockett v. Ohio*, 438 U.S. 586 (1978), the Supreme Court held that:

> [T]he Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. . . .

> Given that the imposition of death by public authority is . . . profoundly different from all other penalties, . . . [the sentencer must be free to give] independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation . . . .

*Id.* at 604–05 (finding Ohio death penalty statute invalid where it permitted consideration of only three mitigating circumstances).

Later, in *Eddings v. Oklahoma*, the Supreme Court applied *Lockett* in a case where the trial judge found he could not consider in mitigation evidence of the defendant's family history.[18]  455 U.S. 104, 112–13 (1982).  The appeals court affirmed the trial court, finding that the mitigation evidence was "not relevant because it did not tend to provide a legal excuse" for responsibility for the crime.  *Id.*  The Supreme Court reversed, explaining that,

> [j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as *a matter of law*, any relevant mitigating evidence. . . . The sentencer . . . may determine the weight to be given relevant mitigating evidence.  But they may not give it no weight by excluding such evidence from their consideration.

*Id.* at 113–15.[19]

---

[18] In *Eddings*, the sentencing judge made clear, on the record, that he could not consider certain evidence as a matter of law.  He stated: "[T]he Court cannot be persuaded entirely by the . . . fact that the youth was sixteen years old when this heinous crime was committed.  *Nor can the Court in following the law, in my opinion, consider the fact of this young man's violent background.*"  455 U.S. at 109 (alteration in original).

[19] The Court later explained that "*Eddings* makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer.  The sentencer must also be able to consider and give effect to

In *Tennard v. Dretke*, the Supreme Court rejected a "nexus test" that would find mitigating evidence relevant only where it bears a causal nexus to the crime. 542 U.S. 274, 287 (2004) ("[W]e cannot countenance the suggestion that low IQ evidence is not relevant mitigating evidence . . . unless the defendant also establishes a nexus to the crime."). Citing *Lockett*/*Eddings*, the Court cautioned that the jury must be given an effective vehicle with which to weigh mitigating evidence so long as the defendant has met a "low threshold for relevance," which is satisfied by "evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Id.* at 284–85.

In *Smith v. Texas*, the Court again considered the use of a nexus test to determine whether any mitigating evidence is relevant. 543 U.S. 37, 45 (2004). The Court "unequivocally rejected" any test requiring a causal nexus between mitigating evidence and the crime. *Id.* We have held that *Tennard* and *Smith* are retroactively applicable to decisions such as the Arizona Supreme Court's 1996 decision in this case. *See Schad v. Ryan*, 671 F.3d 708, 723 (9th Cir. 2009) (per curiam), *cert. denied*, 133 S. Ct. 432 (2012).

Thus, under federal law clearly established by the Supreme Court, we review (1) whether the trial court *considered* all relevant mitigating evidence, as required by *Lockett* and *Eddings*; and (2) whether the Arizona Supreme

---

that evidence in imposing sentence." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (internal quotation marks omitted), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002) (holding that executions of mentally retarded criminals constitute cruel and unusual punishment under the Eighth Amendment).

Court applied an unconstitutional causal nexus test to exclude evidence proffered in mitigation, contrary to, or an unreasonable application of, *Tennard* and *Smith*.

The Arizona Supreme Court did not exclude any of Hedlund's mitigating evidence. Nor did it employ an unconstitutional nexus test. Therefore, its conclusion that the aggravating circumstance "clearly outweighs the minimal mitigating evidence," was not contrary to, nor an unreasonable application of, clearly established federal law.

### 1. All mitigating evidence was considered as required by *Eddings*.

The Arizona Supreme Court did not violate *Eddings*, because it considered all mitigating evidence presented by Hedlund. The Arizona Supreme Court clearly understood and applied the controlling Supreme Court precedent. *See McKinney*, 917 P.2d at 1226. While the trial court was required to consider all mitigating mental health evidence, the Arizona Supreme Court recognized that the trial court was vested with "broad discretion . . . to determine the weight and credibility given to it." *Id.* Thus, because the trial judge did not fail to consider the experts' psychological testimony but instead found some of the opinions lacking in credibility, the Arizona Supreme Court properly concluded that Hedlund's constitutional rights were not violated. *See Lopez v. Schriro*, 491 F.3d 1029, 1037–38 (9th Cir. 2007) (reviewing court's conclusion that trial court had reviewed all mitigating evidence is not objectively unreasonable under AEDPA when based on trial court's statement that it reviewed all such evidence).

The Arizona Supreme Court's decision demonstrates that no mitigating evidence was excluded. The Arizona Supreme Court considered and shared the trial court's view of the mitigating evidence. It noted that childhood abuse "does not necessarily have substantial mitigating weight absent a showing that it significantly affected or impacted a defendant's ability to perceive, to comprehend, or to control his actions." *McKinney*, 917 P.2d at 1227. Because no such evidence was offered, the reviewing court concluded that the trial court did not err in declining to extend leniency based on these circumstances. *Id.* The reviewing court also found little evidence that alcohol impaired Hedlund's judgment. *Id.*

With respect to the aggravating circumstances, the Arizona Supreme Court struck the use of Hedlund's second degree murder conviction as a statutory aggravating factor constituting a prior conviction for a crime of violence. *Id.* at 1229. Where Hedlund could have been convicted on a theory of reckless indifference, the court found that this conviction did not qualify as a crime of violence. *Id.* The court upheld the statutory aggravating factor of pecuniary gain based on Hedlund's killing for the purpose of financial gain. *Id.* at 1231.

Because one aggravating factor was stricken, it was necessary to reweigh the remaining aggravating factor against all of the mitigating factors. *Id.* Because "the [trial] judge did not improperly exclude mitigating evidence at sentencing and the mitigating evidence [was] not of great weight," the Arizona Supreme Court found that it could properly reweigh the evidence rather than remand to the trial court. *Id.* The court stated, "In our reweighing, we must decide whether the sole aggravator – pecuniary gain – outweighs the mitigating circumstances discussed above or whether those mitigators

are sufficiently substantial to call for leniency." *Id.* The court found that, "[i]n comparison to the mitigating circumstances here, the quality of the aggravating circumstances is great." *Id.* The court noted that, in some cases where pecuniary gain was the only aggravating factor, the death penalty was not imposed. *Id.* However, in Hedlund's case, his conduct gave "great weight to the aggravating circumstance." *Id.* The court therefore concluded that "the aggravating circumstance of pecuniary gain clearly outweighs the minimal mitigating evidence." *Id.*

The foregoing analysis by the Arizona Supreme Court demonstrates that no mitigating evidence was excluded. Rather, it was considered and weighed against the aggravating factor of pecuniary gain. This procedure comports with *Eddings*, which requires only that all mitigating evidence be considered. *Eddings*, 455 U.S. at 113–15 (stating that while the sentencer may not exclude mitigating evidence as a matter of law, "[t]he sentencer . . . may determine the weight to be given relevant mitigating evidence").

While the Arizona Supreme Court's consideration of the mitigating circumstances largely mirrored that of the trial court, a review of the sentencing transcript shows that the record supports the Arizona Supreme Court's decision. At sentencing (tracking the rule announced in *Lockett*), the trial court noted that "[t]he sentence imposed should reflect a reasoned, moral response to the defendant's background, character, and the crime." The court recognized the "individualized sentence" requirement and specifically cited its duty under *Eddings* and *Lockett* to "weigh carefully, fairly, objectively, all of the evidence offered at sentencing,

recognizing that not everyone who commits murder should be put to death."

Turning to the mitigating evidence, the trial court discredited an expert opinion that Hedlund's conduct was affected by alcohol. The court stated that "there was [no] reliable, credible evidence to support the conclusion that the information relied upon by Dr. Shaw was accurate or truthful," where that information was based on Hedlund's self-serving statements. Although the trial court nonetheless "considered evidence of alcohol consumption as evidence of mitigation, there [was] little to demonstrate that it in any [way] substantially affected the defendant's ability to understand the unlawfulness of his conduct." Thus, because it was not reliable and credible, the court assigned little weight to the mitigating evidence of alcohol use. The Arizona Supreme Court found the trial court did not err and similarly gave the mitigating evidence of alcohol use little weight. *Id.* at 1227. Neither court excluded this evidence in violation of *Eddings*.

Next, the trial court considered evidence of Hedlund's upbringing. However, the court found that "there was no persuasive testimony presented that leads to the conclusion that the abuse . . . the defendant suffered as a child resulted in him being under unusual or substantial duress at the time of the murders." The Arizona Supreme Court largely adopted the trial court's view of this evidence and found that it was not substantially mitigating to overcome the aggravating factor. *Id.* Again, neither court excluded the evidence in violation of *Eddings*. Because all mitigating evidence was considered, there was no constitutional error.

The dissent believes the sentencing court betrayed its responsibility under *Eddings* because it "never indicated that its analysis . . . , clearly requiring a nexus between the child abuse and the crime, went to the weight it was giving the evidence, rather than its relevance." However, the sentencing court stated that it had reached its decision "after *carefully considering and weighing* all of the aggravating or mitigating factors," including "the child abuse which the Court finds is a fact." (emphasis added). If the sentencing court had unconstitutionally determined that the child abuse were irrelevant, as the dissent suggests, there would have been no need to weigh it against the aggravating factors.

Even if the dissent's erroneous reading of the record were correct, we may not infer unconstitutionality from a sentencing court's silence as to how it used the causal nexus test. Such an inference would fly in the face of Supreme Court precedent, which requires that we "presum[e] that [the] state courts know and follow the law." *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002).

Hedlund argues that a state court may not simply give "lip service" to mitigating evidence by merely saying it considered the evidence; instead, no barriers may prevent the sentencer from giving effect to all mitigating evidence. Hedlund identifies no such barriers in this case. In *Penry*, the Court reversed and remanded a death sentence under *Lockett*/*Eddings* where the jury was unable to give effect to all mitigating evidence. *See Penry*, 492 U.S. 302 at 328. Unlike in *Penry*, however, the sentencer's review of mitigating evidence in Hedlund's case was not constricted by statutory special issue questions or any other limiting checklist of factors to be considered in mitigation. *See id.* at 323–25, 328. Although Arizona law provides for statutory

mitigating factors, one cannot exclude evidence in mitigation simply because it does not meet the criteria of a statutory factor.[20]  Indeed, such a rule would run contrary to  Supreme Court authority.  The Arizona Supreme Court's independent consideration of Hedlund's mitigating evidence illustrates the rule allowing for broad consideration of all mitigating factors. Its consideration of such evidence tracked the trial court's review of that evidence.  In recognition of the rule that mitigating evidence may not be categorically excluded, the trial court accepted the mitigating factors of Hedlund's "dependent personality traits, his past drug and alcohol abuse, and child abuse," notwithstanding the fact that none rose to the level of a statutorily enumerated factor.

After considering all of the mitigating factors, the Arizona Supreme Court found that the aggravating circumstance

_____

[20] While a sentencer may assign statutory mitigating factors more weight, this does not render non-statutory mitigating factors weightless either in principle or in practice.  In some cases, the Arizona Supreme Court has reversed the death penalty without specifically finding any statutory mitigating factors, based on its conclusion that the mitigation presented, even without a causal connection to the crime, outweighed the aggravating circumstance of pecuniary gain.  *See, e.g.*, *State v. Rockwell*, 775 P.2d 1069, 1079 (Ariz. 1989) ("This defendant's character and background, together with his age at the time of the murder and the unique circumstances of his conviction, cause us to conclude that a sentence of death is inappropriate in this case."); *State v. Marlow*, 786 P.2d 395, 402 (Ariz. 1989) ("[T]he result of our review discloses one substantial aggravating factor to be weighed against *any* mitigation that appears in the record.  On the other side of the scale, the trial court did not weigh at all a substantial mitigating factor, the dramatic disparity in sentence between the defendant's death sentence and the co-defendant's four year prison term." (emphasis added)).

heavily outweighed the minimal mitigating evidence.[21]  *Id.* at 1231.  At no time did the court demonstrate an inability to give effect to this evidence, based on Arizona law or otherwise.  Instead, the court considered all the mitigating evidence and, in its sound discretion as sentencer, gave it less weight than the aggravating evidence.  Because nothing stood in the way of the state courts' ability to give effect to Hedlund's mitigating evidence, there was no constitutional error under *Penry*.

### 2.  The Arizona Supreme Court did not apply an unconstitutional nexus test to Hedlund's mitigating evidence.

While we have recognized that, in some cases, the Arizona Supreme Court has improperly applied a causal nexus test before considering mitigating evidence to be relevant,[22] we conclude that the court did not apply such a test here.  Notably, absent a "clear indication" that the state court applied an unconstitutional causal nexus test, "we cannot assume the courts violated *Eddings*'s constitutional mandates."  *Schad*, 671 F.3d at 724.  Nothing in the Arizona Supreme Court's independent review, nor in the trial court's sentencing transcript (to the extent the supreme court adopted

---

[21] Similarly, the trial court concluded that "none of the mitigation considered by the Court in this case, either individually or cumulatively, are sufficiently substantial to call for leniency."

[22] *Schad*, 671 F.3d at 722–23 ("Before *Tennard* was decided, Arizona courts recognized a nexus test, similar to that rejected in *Tennard*, to preclude consideration of evidence of childhood abuse unless the abuse bore a causal connection to the crime of conviction. . . . After *Tennard*, however, the Arizona Supreme Court has clarified that the nexus test affects only the weight of mitigating evidence, not its admissibility.").

the trial court's reasoning), suggests that any mitigating evidence could not, as a rule, be given effect based on lack of nexus.[23]    While the Arizona Supreme Court ultimately decided that the cumulative weight of the mitigating evidence did not call for leniency, this conclusion is based on the *weight* assigned to mitigating factors, not the outright rejection of those factors based on a lack of nexus.  Assigning less weight to mitigating factors because they did not influence Hedlund's conduct at the time of the crime does not show that the sentencer was prevented from giving effect to such evidence because it lacked a causal nexus to the crime. *See Schad*, 671 F.3d at 723 ("The United States Supreme Court has said that the use of the nexus test in this manner is not unconstitutional because state courts are free to assess the weight to be given to particular mitigating evidence."). Instead, it demonstrates that a sentencing court may exercise its discretion in assigning particular weight to particular evidence.  As we have previously recognized, this approach is not contrary to clearly established federal law. *See Towery v. Ryan*, 673 F.3d 933, 944–45 (9th Cir. 2012), *cert. denied*, 132 S. Ct. 1738 (2012).

In *Towery*, we reviewed the Arizona Supreme Court's rulings that (1) the sentencing court "must consider the defendant's upbringing if proffered but is not required to give it significant mitigating weight" and (2) the question of "[h]ow much weight should be given proffered mitigating

---

[23] The sentencing hearing transcript demonstrates that the trial court did not express an inability to weigh the mitigating evidence.  Indeed, the court considered evidence of Hedlund's personality traits, substance abuse, and abuse as a child.  The court discussed these mitigating factors several times, suggesting that it gave effect to whether leniency was warranted, and did not just pay "lip service" to the mitigation, as Hedlund argues.

factors is a matter within the sound discretion of the sentencing judge." *Id.* at 944. We found these rulings to be "correct statements of the law." *Id.* We also affirmed the ruling that "a difficult family background is not always entitled to great weight as a mitigating circumstance," and "where the defendant fails to connect his family background to his criminal conduct, a trial judge could give it little or no weight or value." *Id.* at 944–45.

Here, like in *Towery*, the Arizona Supreme Court noted that "[a] difficult family background, including childhood abuse, does not necessarily have substantial mitigating weight absent a showing that it significantly affected or impacted a defendant's ability to perceive, or to comprehend, or to control his actions." *McKinney*, 917 P.2d at 1227. Affirming a sentencing court's discretion over the *weight* to assign mitigating evidence in no way alleviates the sentencing court's obligation to *consider* any and all mitigating evidence without regard to a causal nexus.

This case is different from *Williams v. Ryan*, where we granted habeas relief after the Arizona state court refused to consider drug addiction as a mitigating factor. *See* 623 F.3d 1258, 1270–71 (9th Cir. 2010) (holding that it was error for state court to refuse to consider the mitigating circumstance of substance abuse simply because Williams "offered no evidence showing that he was intoxicated when he murdered [the victim]"). Here, the Arizona Supreme Court acknowledged that the trial court did not *refuse to consider* evidence of substance abuse or family history, because it lacked a nexus to the crime. Rather, it considered and credited evidence of both, but concluded that their weight was not great enough to overcome the aggravating circumstance. Specifically, the Arizona Supreme Court stated, "In

comparison to the mitigating circumstances, the quality of the aggravating circumstance is great." *McKinney*, 917 P.2d at 1231. Thus, it concluded that "the aggravating circumstance of pecuniary gain clearly outweighs the minimal mitigating evidence." *Id.* Clearly established federal law mandates that the sentencer *consider* all relevant mitigating evidence without regard to whether that evidence bears a causal nexus to the crime; it says nothing about the *weight* the sentencer must assign to such evidence. *See Eddings*, 455 U.S. at 115 (recognizing that in some cases, evidence of a difficult family history and emotional disturbance "properly may be given little weight").

The dissent makes much of the Arizona Supreme Court's citation to *State v. Ross*, 886 P.2d 1354 (Ariz. 1994). In *Ross*, the Arizona Supreme Court stated "[a] difficult family background is not a *relevant* mitigating circumstance unless 'a defendant can show that something in that background had an effect or impact on his behavior that was beyond the defendant's control.'" *Id.* at 1363 (emphasis added) (quoting *State v. Wallace*, 773 P.2d 983, 986 (Ariz. 1989)). The dissent argues that the Arizona Supreme Court's citation to *Ross* demonstrates that it held the mitigation evidence irrelevant and unconstitutionally excluded it for its lack of causal nexus to the crime.

We reject this argument, just as we rejected a similar argument in *Towery*, where the Arizona Supreme Court supported its decision with a citation to *Wallace*. *See Towery*, 673 F.3d at 946. While the *Towery* court deemed *Wallace* (and, by extension, *Ross*) "constitutionally suspect," this does not end the analysis. *See id*. We must review the record in Hedlund's case to determine whether the sentencing court and the Arizona Supreme Court actually applied the

unconstitutional test. *See id*. For the reasons stated above, we conclude that the Arizona Supreme Court did not apply an unconstitutional nexus test, notwithstanding the citation to *Ross.* Because Hedlund's mitigating evidence was considered without regard to a causal nexus to the crime, there is no constitutional error.

## VI.  Ineffective Assistance of Counsel During Penalty Phase[24]

### A.  Background and procedural history

At trial, Hedlund presented expert testimony from Dr. Ronald Holler, who had conducted a "Neuropsychological and Psychological Evaluation" of Hedlund before trial. Dr. Holler noted that Hedlund reported drinking up to twelve beers on the night of the burglary-murder. He found that Hedlund's intoxication was a function of his "alcohol dependence." He then discussed in some detail Hedlund's "extremely dysfunctional" early childhood experiences. Dr. Holler found that Hedlund had a "misguided loyalty" toward McKinney and had a limited understanding of his "personality inadequacies." Regarding Hedlund's "Intellectual/Neuropsychological Functioning," he found a "low average" IQ. He also found Hedlund may have scored low on certain tests due to an "underlying depressive status" and that Hedlund displayed "a slight indication of a learning disability."

---

[24] The district court declined to grant a COA on this issue. However, because we conclude that the district court's resolution of the issue is "debatable amongst jurists of reason," *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003), we address it.

Dr. Holler "evaluate[d] various aspects of [Hedlund's] intellectual, cognitive, neuropsychological, [and] emotional functioning as related to his background with his family and other aspects of his environment." One of the tests Dr. Holler administered was the "Concise Neuropsychological Scale." He focused on "the abuse [Hedlund] suffered and the resulting psychoneurological effects" of that abuse. He opined that Hedlund suffered from "Post-traumatic Stress Disorder [PTSD], as well as some intertwined disorders of much consequence, including the alcohol dependence and a depressive disorder." He explained how the psychological and physical abuse Hedlund suffered can lead to these disorders.

Specifically, Dr. Holler explained the "neuropsychological impairment" that can result and stated that Hedlund showed "some indications of a very significant but yet in a sense mild neuropsychological deficit." Counsel then specifically inquired about brain damage.

Q: Did you find any indication of right hemisphere brain dysfunction or disorder?

A: There were indications of this. His verbal IQ was 91, performance IQ was 78. Essentially we talk about the verbal IQ as being primarily associated with left hemisphere functioning and this does refer then to receptive and expressive speech, reading capability and verbal memory. . . . [The test results provide] further evidence that the right hemisphere is not functioning as well as the left hemisphere. This may well be related to some of the physical abuse that he

experienced, including being hit on the back
of the head.

Dr. Holler went on to explain that damage to the right
hemisphere could affect someone's judgment. On redirect, he
clarified that, while Hedlund was not "severely retarded" or
"totally psychotic," Hedlund did have "neurological
impairments which impaired his judgment."

Dr. Charles Shaw, M.D., a medical addiction specialist,
also testified regarding Hedlund's alcoholism. He testified
that alcoholism can lead to organic brain damage. He also
believed that Hedlund's actions with respect to the crimes
were influenced by his alcoholism.

At sentencing, the trial court did not find credible
evidence to support Dr. Shaw's conclusion that Hedlund was
affected by alcohol at the time of the crimes. Instead, the
court found that Hedlund had a motive to lie about the extent
of his alcohol consumption and his statements conflicted with
those of his sisters and a presentence report from an earlier
conviction.

The court also discounted Dr. Holler's testimony, because
(1) he did not raise PTSD in his initial report, instead
announcing it for the first time while testifying; (2) some of
the foundational information upon which Dr. Holler based his
opinions was self-reported by Hedlund; and (3) some of the
conclusions were based on an erroneous presentence report.

During PCR proceedings, Hedlund proffered a report
from Dr. Marc S. Walter, a neuropsychologist. Dr. Walter
conducted a battery of tests on Hedlund and found certain
results consistent with a diagnosis of alcohol abuse. He also

found "Cognitive Disorder, Not Otherwise Specified," a disorder "that used to be termed Organic Mental Disorder and indicates the presence of brain damage," and stated that Hedlund may have "residual problems" with PTSD. In light of these results, Dr. Walter concluded that Hedlund had brain damage at the time of the offenses in 1991.

Dr. Walter admitted that the test used by Dr. Holler was a "screening test for brain damage." He expressed a preference, however, for the battery of tests he administered because they are a "comprehensive neuropsychological test battery." Dr. Walter stated that screening tests such as those used by Dr. Holler "are relatively insensitive and often miss the presence of brain damage." Dr. Walter concluded by stating that he believed that Hedlund's brain damage, as augmented by his alcohol use, prevented Hedlund from "understand[ing] the consequences of his involvement in the burglaries and the murders . . . ."

The PCR court reviewed Dr. Walter's report but concluded that counsel's efforts during sentencing did not fall below the standard expected of reasonable death-penalty trial lawyers. The court noted that Dr. Walter's report would not support an insanity defense, and nothing in the record suggested Hedlund was unaware of his involvement in the crimes. The court continued that "[t]he fact that an attorney, after the fact, obtains an opinion from an expert which might have supported an alternative theory at trial does not demonstrate, without more, that the strategy chosen by defense counsel at the time of trial was ineffective."

The court rejected the argument that counsel did not present sufficient evidence of the neuropsychological effects of Hedlund's child abuse and alcohol abuse. The court stated

that it was adequately informed of these conditions by Drs. Holler and Shaw. The court found that Dr. Walter's report was not substantially or significantly different from the earlier expert reports. The court challenged Dr. Walter's conclusion that Holler did not diagnose brain damage, which in fact he did.

The district court reviewed all of the expert testimony and reports proffered during the penalty phase and in PCR proceedings. Based on that review, the court concluded that it was not objectively unreasonable for the PCR court to find that (1) the penalty phase experts' opinions and PCR expert's opinion were substantially the same, and (2) Dr. Holler entertained a diagnosis of brain impairment. The district court also found that the PCR court did not unreasonably apply *Strickland*. It rested this holding only on the performance prong, finding analysis of the prejudice prong unnecessary.

## B. The state court did not unreasonably apply *Strickland*.

On federal habeas review of ineffective assistance of counsel claims, courts apply the clearly established federal law set forth in *Strickland v. Washington*. *E.g.*, *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011). Under *Strickland*, we must first ask whether "counsel's assistance was reasonable considering all the circumstances." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Counsel is granted "wide latitude . . . in making tactical decisions," and "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. We must also "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* In the context of that presumption, we "determine whether, in light

of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690.

Even a "professionally unreasonable" error by counsel will not warrant setting aside a judgment, unless it was "prejudicial to the defense." *Id.* at 691–92. To establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The PCR court's factual findings were not objectively unreasonable. The findings, that the reports of Drs. Holler and Shaw were substantially the same as Dr. Walter's proffered report and that Dr. Holler diagnosed brain damage, are supported by the record. Dr. Holler found that Hedlund suffered from alcohol dependence, PTSD, and a depressive disorder. Dr. Holler also explained how neurological impairment can result from those factors, and that Hedlund had indications of "a very significant but yet in a sense mild neuropsychological deficit." Dr. Walter admitted that the test used by Dr. Holler screens for brain damage and Dr. Holler found that Hedlund had a right hemisphere dysfunction or disorder and that this could impair his judgment. Dr. Shaw testified about Hedlund's alcoholism and its effects on Hedlund. Similarly, Dr. Walter opined about brain damage and its impact at the time of the offense.

### 1. It was not objectively unreasonable for the state PCR court to conclude that counsel's performance was not deficient.

The PCR court's application of *Strickland* was also not unreasonable. Hedlund's counsel's performance was reasonable considering the circumstances. Counsel hired a psychologist to testify about Hedlund's various mental and personality defects, including neuropsychological impairments to his brain. Counsel also hired a psychiatrist to testify about Hedlund's severe alcoholism. Counsel's tactical decisions of precisely which experts to hire must be afforded deference. Hedlund's proffer of additional experts on collateral review who say substantially the same thing does not call into question the reasonableness of counsel's decisions. Counsel's strategy to present testimony about Hedlund's troubled childhood and ongoing psychological, neuropsychological, and medical conditions cannot be said to fall outside the wide range of professionally competent assistance.

Hedlund argues that the PCR court contradicted itself with respect to the expert testimony presented during sentencing. Specifically, on PCR review, the court found testimony by Drs. Holler and Shaw sufficient to paint a picture of Hedlund's condition. However, Hedlund argues that when sitting as the sentencing court, the court discredited the same experts' testimony.

That the sentencing court discredited certain aspects of Drs. Holler and Shaw's testimony does not discredit the PCR court's conclusion that their opinions were substantially the same as that proffered by Dr. Walter. During sentencing, the court discredited Dr. Shaw's conclusion that Hedlund was

affected by alcohol at the time of the crimes. The court found this self-reported information suspect, because of Hedlund's motive to lie. The court also questioned why Dr. Holler raised PTSD for the first time while testifying–when he had not cited it in his report–and noted that some of the conclusions were based on erroneous information contained in a PSR. These observations do not call into question Dr. Shaw's conclusion that Hedlund suffered from alcoholism or Dr. Holler's conclusion that Hedlund suffered from a brain impairment.[25] They simply speak to the weight afforded the experts' opinions in determining mitigation–weight based on reliability and credibility. To the extent Dr. Walter's testimony also relied on the sentencing transcript, reports from family members, and information self-reported by Hedlund, it would be unreliable for the same reasons.

---

[25] The record does not support the dissent's argument that "[b]ecause Hedlund's counsel had presented unreliable expert testimony, it was as if he had presented none at all." Although the sentencing court discredited Dr. Shaw's conclusion that Hedlund was affected by alcohol at the time of the crimes, the sentencing court did not discredit Dr. Shaw's opinion that Hedlund suffered from alcohol abuse generally. While there was a question as to the nature and extent of the alcohol abuse, the sentencing court specifically stated that it would be considered as a mitigating factor. With respect to Dr. Holler, the sentencing court explained that it afforded the testimony "little weight," because the failure to include PTSD in the original expert report was "unpersuasive at best." While the sentencing court questioned the value of Dr. Holler's opinions, it did not discredit the opinion on child abuse; however, it found no duress from such abuse at the time of the murders.

The sentencing court went on to explain how it *considered* Hedlund's "dependent personality traits, his past drug and alcohol abuse, and child abuse." These are all areas on which Hedlund's experts opined. While the sentencing court discredited certain aspects of the experts' testimony based on unreliability, the record demonstrates that the sentencing court did not wholly exclude the experts' testimony.

Hedlund also argues that counsel did not have "a complete picture" of his brain damage and, if counsel would have hired a neuropsychology expert, the expert could have "definitively concluded" that Hedlund had brain damage. However, as explained above, the PCR court did not make objectively unreasonable factual determinations that evidence of brain damage presented at sentencing was similar to that proffered to the PCR court. Hedlund has also failed to rebut the presumption that counsel's preparation of the expert witnesses for sentencing fell below the wide range of professionally acceptable conduct.

## 2.  Prejudice

Because Hedlund has not shown that counsel's performance was deficient, we need not reach the question of prejudice.

## CONCLUSION

The district court properly denied relief on Hedlund's claims regarding (1) use of the visible leg brace, (2) use of dual juries, (3) juror bias, (4) ineffective assistance of counsel during the plea process, (5) consideration of mitigating evidence under *Lockett/Eddings* and their progeny, and (6) ineffective assistance of counsel during the penalty phase. Denial was proper because the Arizona Supreme Court's decision denying relief was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts.

**AFFIRMED.**

WARDLAW, Circuit Judge, concurring in part and dissenting in part:

I respectfully dissent from Parts I, IV, V, and VI of the majority opinion, and concur in the remainder.[1] Because the relevant state court decisions addressing Hedlund's *Eddings*,[2] ineffective assistance of counsel, and shackling claims are unreasonable applications of clearly established Supreme Court precedent and include unreasonable factual determinations, I would reverse and remand this appeal.

Charles Michael Hedlund's constitutional rights were violated at every stage of his proceedings, from his plea negotiations to his sentencing, yet the Arizona courts affirmed on direct appeal and denied his petition for post-conviction relief. First, Hedlund's trial counsel allowed a plea offer to expire that would have likely saved Hedlund from a death sentence. Then, during the trial that resulted from that failure, Hedlund was shackled, in view of the jury and without an individualized determination that he, rather than his co-defendant James McKinney, posed a threat to courtroom security or an escape risk. After Hedlund was convicted, his counsel failed to present an expert who could have testified definitively that Hedlund suffered from brain damage. Finally, the sentencing court erroneously refused to

---

[1] I agree that the remaining uncertified issues are not "debatable amongst jurists of reason," *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003), and therefore need not be discussed.

[2] As Chief Judge Kozinski recently predicted, Hedlund's petition is yet another example of the state courts applying an unconstitutional causal nexus test before imposing and affirming a sentence of death. *See Poyson v. Ryan*, 743 F.3d 1185, 1188 (9th Cir. 2013) (Kozinski, C.J., dissenting from the denial of rehearing en banc).

consider Hedlund's mitigation evidence because Hedlund could not show that any of his mitigating circumstances bore a causal nexus to his crimes.

In examining the reasonableness of the state courts' decisions under 28 U.S.C. § 2254(d), we look to the last reasoned state court opinion on the claim. *Milke v. Ryan*, 711 F.3d 998, 1005 (9th Cir. 2013) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991)). The relevant state courts' decisions were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" and were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). These constitutional violations had a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)), thus entitling Hedlund to habeas relief. Therefore, I would reverse the district court's decision and remand with instructions to grant a conditional writ of habeas corpus setting aside Hedlund's conviction and sentence.

## I.

Although Hedlund raises a number of constitutional claims, not all of them are legally cognizable. A complete picture of Hedlund's trial and sentencing, however, is important to appreciate the context in which Hedlund's constitutional rights were violated. Hedlund's case should never have proceeded to trial. First, the trial court judge, Judge Sheldon, rejected a plea agreement that the government and Hedlund had agreed upon after reading letters from one

of the victims' families asking him to do so, but indicated he would accept an agreement with greater accountability for McClain's death. Second, Hedlund's trial counsel allowed the deadline to expire for a second plea agreement, which would have spared Hedlund from a death sentence while providing for the greater accountability that Judge Sheldon demanded.

Hedlund was tried with his half-brother and co-defendant James McKinney. Judge Sheldon initially granted Hedlund's unopposed motion for a severance, but then sua sponte decided to empanel dual juries instead, over both the defendants' and State's objections and contrary to then Arizona law. *See State v. Lambright*, 673 P.2d 1, 7 (Ariz. 1983). On a petition for special action, the Arizona Court of Appeals vacated the trial court's order pursuant to *Lambright*. The Arizona Supreme Court reversed, and overruled its own precedent, by overturning *Lambright* and holding that Judge Sheldon's decision to empanel a dual jury was properly within his discretion. *Hedlund v. Sheldon*, 840 P.2d 1008, 1011 (Ariz. 1992) (en banc). Judge Sheldon also decided, based on ex parte, triple-hearsay inmate information *that did not even identify Hedlund*, that Hedlund should be shackled, and then conducted a hearing on the matter only so he could make a record of his decision.

Hedlund's counsel moved to recuse Judge Sheldon based on the appearance of impropriety in his sua sponte and one-sided pretrial rulings. On the same day that Judge Sheldon conducted a hearing on the shackling issue, he was defending himself against Hedlund's recusal motion before one of his colleagues. Hedlund's recusal motion was denied. Judge Sheldon then refused to direct that a curtain or other barrier be placed around Hedlund's table so that the jury would not

see the shackles. Judge Sheldon proceeded to conduct the trial in a manner unfair to Hedlund, including conducting the voir dire of a key prosecution witness—voir dire that Hedlund's counsel had requested—outside of Hedlund's counsel's presence. Because Judge Sheldon concluded that McKinney and Hedlund had an "identity of interests," he determined that McKinney's counsel's presence was sufficient representation of Hedlund.

At sentencing, Judge Sheldon found Hedlund's expert mental health evidence not credible, dismissed his mitigating evidence of child abuse as not related to the crime, and sentenced Hedlund to death.

Finally, when Judge Sheldon "became" the state post-conviction relief ("PCR") court,[3] he acted as a witness in the case, opining that Hedlund's counsel had been very diligent and effective, and denied Hedlund's request to develop the record through an evidentiary hearing where his experts could testify. The Arizona Supreme Court summarily affirmed the PCR court's denial of relief. It is clear that Hedlund did not receive a fair trial, and has not yet had access to a meaningful review of his claims. Under AEDPA's deferential standard, Hedlund's *Eddings*, ineffective assistance of counsel, and shackling claims entitle him to habeas relief.

---

[3] As a consequence of Arizona's state habeas system, *see* Ariz. R. Crim. P. 32.3, Hedlund's petition for post-conviction relief was reviewed in superior court by the same judge who presided over his underlying criminal case.

## II.

Under *Eddings v. Oklahoma*, 455 U.S. 104 (1982), a state court may not treat mitigating evidence of a defendant's background as "irrelevant or nonmitigating as a matter of law" merely because it lacks a causal connection to the crime. *Towery v. Ryan*, 673 F.3d 933, 946 (9th Cir. 2012) (per curiam), *cert. denied*, 132 S. Ct. 1738 (2012). Here, the state courts did precisely what *Eddings* prohibits: they found mitigating evidence of Hedlund's abusive childhood as a matter of fact, but treated it as nonmitigating as a matter of law because it lacked a causal connection to the crime.

## A.

Words fail to adequately describe the horrors that Hedlund suffered as a child. Indeed, Hedlund's mental health expert, Dr. Holler, described Hedlund's childhood as "probably as gruesome as anything that I have come across in 25-plus years in this business." The testimony of Hedlund's half-sisters and aunt paint a ghastly picture of extreme physical and emotional abuse. Hedlund and his three half-siblings were raised in the outskirts of Chandler, Arizona, by Shirley and James McKinney, Sr. Shirley and James Senior, however, were not Hedlund's biological parents. Hedlund was conceived during an extramarital affair that Hedlund's mother, who was James Senior's first wife, had with a man named Charles Hedlund. Growing up with the McKinneys, Hedlund was reminded daily that he was not a McKinney.[4]

---

[4] Hedlund lived with Shirley and James McKinney, Sr. from ages six to fourteen. When he was twelve years old, Shirley told him that he had been conceived during his biological mother's affair with another man,

Hedlund lacked even the basic necessities as a child. He grew up living in filth and was rarely clothed. His home was covered in animal feces, bile, urine, used female hygiene products, and dirty diapers. Hedlund and his siblings were forced to share a very small room with a variety of domesticated and exotic animals, including, at times, a goat, a calf, a spider monkey, and snakes. The children were terrified of snakes, but Hedlund's stepparents nevertheless housed the snakes in the children's closet. Hedlund and his siblings were also not allowed to eat anything unless they received permission from Shirley McKinney. At least once a month, she would lock the children in the house while she went shopping and threaten that if they ate anything while she was gone, she would beat them. During the summer, Shirley would lock Hedlund and his siblings out of the house in heat exceeding 100 degrees. Because they were usually wearing only underwear, Hedlund and his siblings were frequently sunburned while locked out of their home. On one occasion, Hedlund's aunt saw the children locked outside in the heat, while Shirley and her own biological daughter, who was favored and spared from Shirley's abuse, sat inside and told Hedlund and his siblings that they were not allowed to drink water from the hose outside. In effect, Shirley and James Senior treated Hedlund and his siblings like the animals they housed in the children's bedroom.

Shirley McKinney tormented her stepchildren, especially Hedlund, who was the oldest and the "bastard." She hit them with belts, old wooden boards, skillets, wire hangers, shovels, garden hoses, or anything else that was within reach when she grew angry. She struck indiscriminately and was often

---

and that James Senior was not, as Hedlund had believed up until then, his biological father.

helped by her own biological daughter, who held down her step-siblings as they were beaten. Hedlund's half-sister Donna testified that she and her half-siblings were punched in the face at least once a day. Hedlund's half-sisters and aunt testified to a number of particular episodes where Hedlund was beaten. For instance, James Senior kept a vicious dog that once attacked Hedlund, who was a small child at the time, and injured his face so badly that he had to receive over 200 stitches. The day after Hedlund received medical treatment, Shirley and her daughter woke Hedlund up in the early morning and beat him for over an hour because his medical treatment had cost them money. Hedlund's aunt also testified to another incident where she saw Shirley violently beat Hedlund and his half-brother James McKinney. James had been kicked off the school bus for fighting and as Shirley was marching him to the house, she clipped off a foot-long piece of a water hose and began beating James with it. James was small enough at the time that Shirley was holding him in the air by his arm while she beat him with the water hose. Hedlund tried to stop Shirley's strikes by jumping on her arm and yelling, "Momma, stop it. Momma, stop it." In response, Shirley pushed Hedlund off and struck him across the face with the hose. Hedlund fell to the ground, hitting the back of his head against the concrete sidewalk.

By any measure, Hedlund's savage childhood was a mitigating factor that the Arizona courts should have considered. But because they applied the prohibited causal nexus test, Hedlund has not yet received the constitutionally-required review that he is due.

## B.

It is well established that when Hedlund was sentenced in 1993, *Eddings* and its progeny required that the sentencer give "independent mitigating weight" to all relevant mitigating evidence. *See Eddings*, 455 U.S. at 110 (internal quotation marks omitted). At that time, the Supreme Court had already clarified that the Eighth and Fourteenth Amendments specifically require the sentencer to fully consider all mitigating evidence, regardless of the lack of a causal connection between the evidence and the defendant's crime of conviction:

> There is no disputing that this Court's decision in *Eddings* requires that in capital cases the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. Equally clear is the corollary rule that the sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence. These rules are now well established . . . .

*Skipper v. South Carolina*, 476 U.S. 1, 4 (1986) (emphasis in original) (internal quotation marks and citations omitted); *see also McKinney v. Ryan*, 730 F.3d 903, 921–22 (9th Cir. 2013) (Wardlaw, J., dissenting), *vacated and reh'g en banc granted*, 2014 WL 1013859 (9th Cir. March 12, 2014).

The last reasoned state court decision addressing Hedlund's *Eddings* claim is the Arizona Supreme Court's

decision on direct appeal. The Arizona Supreme Court reviewed the sentencing court's mitigation findings for abuse of discretion and held that the sentencing court "did not err in concluding that Hedlund's family background was not sufficiently mitigating to require a life sentence." *State v. McKinney*, 917 P.2d 1214, 1227 (Ariz. 1996) (en banc), *superseded by statute on other grounds as stated in State v. Martinez*, 999 P.2d 795, 806 (Ariz. 2000) (en banc). Then, after concluding that the trial judge erred in finding one of the two aggravating factors it applied in Hedlund's case, the Arizona Supreme Court reweighed the aggravating and mitigating circumstances. However, the Arizona Supreme Court applied no "reasoned and individualized" independent analysis of the evidence of childhood abuse that Hedlund presented in mitigation. *Cf. Towery*, 673 F.3d at 945 ("The [Arizona] supreme court also independently weighed the mitigating evidence against the aggravating circumstances to determine whether leniency was called for. As part of that review, the court considered whether evidence of Towery's difficult childhood should be given substantial weight.") (internal alterations, quotation marks, and citations omitted). Instead, the Arizona Supreme Court adopted the sentencing court's analysis of the mitigation evidence, noting only that "the judge did not improperly exclude mitigating evidence at sentencing and the mitigating evidence is not of great weight." *McKinney*, 917 P.2d at 1231. Because the Arizona Supreme Court adopted the sentencing court's mitigation analysis, reviewing it for abuse of discretion and conducting no reasoned and individualized independent analysis of its own, we must "look at both decisions to fully ascertain the reasoning of the last decision." *Id*. at 944 n.3 (quoting *Barker v. Fleming*, 423 F.3d 1085, 1093 (9th Cir. 2005)).

The sentencing court found evidence of Hedlund's tortured childhood "compelling and credible" and then presented its analysis of the mitigation evidence:

> I have considered [the childhood abuse]. I think it is the Court's obligation to consider it, whether or not it complies with the requirements in (G)(1) [a statutory mitigating factor].
>
> I have also considered all of the other mitigating factors which were set forth in three separate pleadings submitted by defense counsel in this case. I have reviewed all of them again as recently as yesterday and some of those factors this morning. The Court, after carefully considering and weighing all of the aggravating or mitigating factors presented in this case, and not limited to the personality traits discussed by Dr. Holler, past drug and alcohol use discussed about [sic] Dr. Shaw, Dr. Holler and the other witnesses who testified, and the child abuse which the Court finds is a fact, that *none of those mitigating factors considered separately or cumulatively indicates to the Court that these factors affected the defendant's ability to control his physical behavior at the time of the offense or to appreciate the wrongfulness of his conduct*, that the defendant was aware at all times while these offenses were occurring that what he was doing was wrong, that he continued to participate in them and that he had the

intelligence and the ability to refuse continued participation.

Sentencing Hr'g Tr. at 23–24, July 30, 1993 (emphasis added). The sentencing court made explicit that it considered and weighed Hedlund's mitigating evidence insofar as that evidence affected Hedlund's capacity *at the time of the crime*. The court evaluated Hedlund's abusive childhood only to the extent it may have "affected the defendant's ability to control his physical behavior at the time of the offense or to appreciate the wrongfulness of his conduct." *Id.* at 24. This refusal to consider and give effect to significant mitigating evidence that the court found credible because it was not tied to his behavior in committing the crime is contrary to *Eddings*. The sentencing court never indicated that its analysis quoted above, clearly requiring a nexus between the child abuse and the crime, went to the weight it was giving the evidence, rather than its relevance.

The majority's conclusion that the Arizona Supreme Court permissibly weighed the mitigating evidence of Hedlund's tormented childhood, and did not improperly apply a causal nexus test, is contrary to the Arizona Supreme Court's plain reasoning. The majority supports its reading of the record based on a single sentence from the Arizona Supreme Court's decision: "A difficult family background, including childhood abuse, does not necessarily have substantial mitigating weight absent a showing that it significantly affected or impacted a defendant's ability to perceive, to comprehend, or to control his actions." *McKinney*, 917 P.2d at 1227. But the majority ignores the legal authority that the court cited to support this rule. The Arizona Supreme Court cited to a portion of its decision in *State v. Ross* that states unambiguously, a "difficult family

background is not a relevant mitigating circumstance unless a defendant can show that something in that background had an effect or impact on his behavior that was beyond the defendant's control."   886 P.2d 1354, 1363 (Ariz. 1994) (internal quotation marks omitted).  If he cannot show this, "Defendant's background therefore is not a mitigating circumstance."  *Id.*  The court in *Ross* did not say that family background unconnected to criminal conduct is of "little or no weight or value."  *Cf. Towery*, 673 F.3d at 945 ("[T]he [Arizona] court's *reasoned and individualized* decision to give [defendant's] evidence little or no weight was not contrary to Supreme Court precedent.") (emphasis in original).  Instead, *Ross* held, as a matter of law, that a causally unrelated family background was not *relevant*.  By deeming the unconnected background evidence not relevant, the *Ross* court applied the impermissible causal nexus test that the U.S. Supreme Court has unequivocally rejected.  *See Smith v. Texas*, 543 U.S. 37, 45 (2004) (per curiam) (stating that the causal nexus test is one "we never countenanced and now have unequivocally rejected"); *Tennard v. Dretke*, 542 U.S. 274, 284–86 (2004) (explaining that the causal nexus test "has no foundation in the decisions of this Court"). In the same way it did in *Ross*, the Arizona Supreme Court impermissibly refused to consider Hedlund's childhood abuse as a mitigating factor.  Although the Arizona Supreme Court cloaked this exclusion in the language of weighing and sufficiency, it plainly and improperly applied a causal nexus requirement.

The majority avoids reaching this conclusion by requiring Hedlund to meet a heightened standard of proof that is not the law of our circuit.  The majority stretches the language of *Schad v. Ryan*, 671 F.3d 708 (9th Cir. 2009) (per curiam), *cert. denied*, 133 S. Ct. 432 (2012), to invent a new legal test

which requires Hedlund to show a "clear indication" that the Arizona courts applied an unconstitutional causal nexus test.[5] Our use of the phrase "clear indication" in *Schad*, however, was very different than the majority's use here. In *Schad*, we concluded that because there was "no indication" that the state courts applied a causal nexus test, "either as a method of assessing the weight of the mitigating evidence, or as an unconstitutional screening mechanism," we would not presume constitutional error absent a "clear indication in the record." 671 F.3d at 724. Thus, we would not presume error from silence. Here, in contrast, the record unquestionably shows that the Arizona courts applied a causal nexus test. The only question is whether they applied the unconstitutional version of the causal nexus test. The "clear indication" test from *Schad*—if it even is a test—helps courts determine whether an *Eddings* violation exists when a record contains no indication that any causal nexus test was used. It was not intended as a tool for determining what variety of causal nexus test a state court applied. Our controlling precedent for determining that question is whether the state court's reasoning "appears to have" imposed the impermissible test. *Styers v. Schriro*, 547 F.3d 1026, 1035 (9th Cir. 2008); *see also Poyson*, 743 F.3d at 1188 (Kozinski, C.J., dissenting from the denial of rehearing en banc). To conclude otherwise is to disavow controlling Supreme Court authority, and blatantly break from our circuit's precedent, as the same majority did in *McKinney v. Ryan*, 730 F.3d at 919–21, *vacated and reh'g en banc granted*, 2014 WL

---

[5] Dissenting in *Poyson v. Ryan*, Judge Thomas accused the majority there of similarly distorting *Schad*'s "clear indication" language "to create a new, more stringent test for determining whether a state court applied an unconstitutional causal nexus analysis." 743 F.3d at 1207 (Thomas, J., dissenting).

1013859 (9th Cir. March 12, 2014); *see also Poyson*, 743
F.3d at 1187–88 (Kozinski, C.J., joined by eleven other
judges, dissenting from the denial of rehearing en banc
because of a similar *Eddings* issue).

Lastly, the Arizona Supreme Court did not remedy its
*Eddings* violation by reweighing the aggravating
circumstance of pecuniary gain against the aggregate
mitigating evidence.   Because the Court had already
determined that evidence of Hedlund's abusive childhood
was not a mitigating factor (because it was not causally
connected to his criminal conduct and, therefore in
accordance with *Ross*, not relevant), that evidence was not
considered in the "minimal mitigating evidence" that the
court reweighed against the aggravating circumstance of
pecuniary gain. *McKinney*, 917 P.2d at 1231.  The Arizona
Supreme Court unconstitutionally applied the causal nexus
test to screen out Hedlund's evidence of childhood abuse and
family background.[6]

---

[6] Whether Hedlund must also show actual prejudice for the writ to issue
is an unsettled question in the Ninth Circuit. *Compare Stokley v. Ryan*,
705 F.3d 401, 404 (9th Cir. 2012) (applying harmless error review to the
Arizona Supreme Court's alleged *Eddings* violation), *and Landrigan v.
Stewart*, 272 F.3d 1221, 1230 & n.9 (9th Cir. 2001) (applying harmless
error review to the state court's failure to consider the defendant's alleged
intoxication and past history of drug use as a nonstatutory mitigating
factor), *adopted by Landrigan v. Schriro*, 501 F.3d 1147 (9th Cir. 2007)
(en banc) (order), *with Williams v. Ryan*, 623 F.3d 1258, 1270–72 (9th Cir.
2010) (granting habeas relief for an *Eddings* violation without conducting
harmless error analysis), *and Styers*, 547 F.3d at 1035–36 (same).  The
issue is also the subject of a split among other circuits. *Compare Bryson
v. Ward*, 187 F.3d 1193, 1205 (10th Cir. 1999) (collecting cases from
multiple circuits applying harmless error review), *with Nelson v.
Quarterman*, 472 F.3d 287, 314–15 (5th Cir. 2006) (en banc) (declining
to apply harmless error review).

### III.

During sentencing, defense counsel presented expert testimony describing Hedlund's alcoholism and the psychological effects of his abusive childhood. In particular, Dr. Holler testified that Hedlund suffered from post-traumatic stress disorder (PTSD), alcohol dependence, and depression. Dr. Holler also testified that because Hedlund was constantly seeking acceptance, he was susceptible to engaging in criminal activity to demonstrate loyalty to his family. However, Judge Sheldon did not find the evidence presented by Dr. Holler and Dr. Shaw, Hedlund's other expert witness, credible. Dr. Holler's evidence was not credited because: (1) he did not raise PTSD in his initial report, instead announcing it for the first time while testifying; (2) some of the information was self-reported by Hedlund; and (3) some of the conclusions were based on an erroneous presentence report. Dr. Shaw's evidence was not credited because his information came from Hedlund, who had a motive to lie about the extent of his alcohol consumption, and his statements conflicted with those of Hedlund's sisters as well as a presentence report from an earlier conviction.

Hedlund claimed before the state PCR court that his trial counsel's assistance was constitutionally deficient during the penalty phase because counsel failed to present competent expert testimony that Hedlund suffered from brain damage that affected his behavior at the time of the offenses. Hedlund offered a report from Dr. Walter, a neuropsychologist, and requested a hearing at which Dr. Walter could testify. The PCR court denied Hedlund's request for an evidentiary hearing, concluding that the opinions of Hedlund's sentencing phase experts were "substantially similar to those of Dr. Walter's" and that "it

was adequately informed of this information through Dr. Holler and Dr. Shaw's opinions." *State v. Hedlund*, No. CR 1991-090926, Minute Entry at 6 (Ariz. Super. Ct. June 1, 2001).

The majority incorrectly frames the issue as whether the state PCR court's finding that the evidence was "substantially similar" is an unreasonable determination of fact. If the sentencing court had credited the evidence, but found it insufficiently mitigating, this would be the correct inquiry. However, here, the sentencing court wholly discredited the expert mental health evidence because the sources underlying each item were questionable. Because Hedlund's counsel had presented unreliable expert testimony, it was as if he had presented none at all. Thus, the only relevant inquiry for the state PCR court was whether Dr. Walter's report was also so unreliable that it (or a similar report procured by competent counsel) would have been rejected by the sentencing court. The state PCR court did not engage in this analysis.

"An unreasonable application of Supreme Court precedent occurs when a 'state-court decision . . . correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case.'" *Libberton v. Ryan*, 583 F.3d 1147, 1161 (9th Cir. 2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 407–08 (2000)). Because the state court unreasonably applied *Strickland* by failing to address the claim of ineffective assistance of counsel presented, and rejected Hedlund's request to develop the record as to this issue, Hedlund is entitled to an evidentiary hearing on this claim. *See Martinez v. Ryan*, 132 S. Ct. 1309, 1317 (2012) (ineffective assistance of counsel claims "often require investigative work" and "often turn[] on evidence outside the trial record"); *see also Cullen v. Pinholster*, 131 S. Ct. 1388,

1400–01 (2011) (citing *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007), for the proposition that "district courts, under AEDPA, generally retain the discretion to grant an evidentiary hearing" and noting that "[s]ection 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief"); *Siripongs v. Calderon*, 35 F.3d 1308, 1310 (9th Cir. 1994) ("In a capital case, a habeas petitioner who asserts a colorable claim to relief, and who has never been given the opportunity to develop a factual record on that claim, is entitled to an evidentiary hearing in federal court.").

## IV.

### A.

Before Hedlund's trial began, his trial counsel and the prosecutor were engaged in plea negotiations, which resulted in two proposed plea agreements. The first plea agreement would have allowed Hedlund to plead guilty to second-degree murder for his involvement in the death of Mertens and to theft with a prior for his involvement in the death of McClain. This plea agreement was presented to and rejected by Judge Sheldon on September 18, 1992. Judge Sheldon rejected the agreement because he wanted the offenses to which Hedlund would plead guilty to reflect greater accountability for the McClain homicide.[7] To give the parties an opportunity to reach a second plea that addressed his concerns, Judge

---

[7] Under Arizona law, the court "may, in its sole discretion, participate in settlement discussions" by directing counsel to "participate in a good faith discussion with the court" to reach a resolution that "conforms to the interests of justice." Ariz. R. Crim. P. 17.4. By contrast, Federal Rule of Criminal Procedure 11(c)(1) expressly mandates that the district court "must not participate" in plea agreement discussions.

Sheldon granted a two-week continuance. The week before the trial was scheduled to begin, the parties were in the final stages of a second plea agreement that addressed Judge Sheldon's concerns. Under the second proposed plea agreement, Hedlund would have pled guilty to the second-degree murder of Mertens, and to two felonies—theft and burglary—in connection with McClain's death. At this point in the proceedings, Hedlund's primary goal was to avoid the death penalty, which the second plea agreement accomplished.

On Tuesday, October 6, 1992, a week before trial was to begin, Hedlund's counsel and the prosecutor called Judge Sheldon to clarify what might be appropriate for the second plea agreement. Judge Sheldon's deadline for the parties to appear to discuss the second plea agreement with the court was two days later, on Thursday, October 8. The prosecutor set a deadline for Hedlund to accept the second plea agreement by Friday, October 9. But instead of presenting this second plea agreement to Judge Sheldon or accepting the prosecutor's offer, Hedlund's trial counsel called the court at the end of the day on October 8 to ask Judge Sheldon to recuse himself, because he believed that the judge was biased against Hedlund. Judge Sheldon refused defense counsel's request, and the deadline to discuss the second plea agreement expired without any further communication from Hedlund's counsel. The next day, Hedlund's counsel filed a motion to recuse Judge Sheldon, and the prosecutor's second plea offer expired. Another judge held a hearing on the recusal motion four days later and denied the motion. Voir dire for Hedlund's trial began that same day.

Hedlund claims that his trial counsel was ineffective in the plea process. The last reasoned court decision addressing

this issue is the Arizona Superior Court's denial of Hedlund's petition for post-conviction relief. The state PCR court's denial of Hedlund's ineffective assistance during plea negotiations claim was an unreasonable application of clearly established federal law as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1).

## B.

"[C]riminal justice today is for the most part a system of pleas, not a system of trials. . . . [T]he right to adequate assistance of counsel cannot be defined or enforced without taking account of the central role plea bargaining plays in securing convictions and determining sentences." *Lafler v. Cooper*, 132 S. Ct. 1376, 1388 (2012). "Ninety-seven percent of federal convictions and ninety-four percent of state convictions are the result of guilty pleas." *Id*. The majority correctly identifies the two-part *Strickland* test applicable to ineffective assistance claims in plea negotiations and properly emphasizes that under AEDPA, review of the state court's application of *Strickland* is "doubly deferential." *See also Harrington v. Richter*, 131 S. Ct. 770, 788 (2011). Where the majority fails, however, is in its examination of the state PCR court's actual reasons for rejecting Hedlund's claim.

After describing Arizona's version of *Strickland*, the state PCR court rejected Hedlund's ineffective assistance claim in four sentences. It said:

> Counsel claimed that Defendant's trial attorney was ineffective in handling his plea negotiations. A hearing was conducted on *this matter* in the trial court and Defendant's attorney properly, aggressively and

> professionally pursued the issue. There was
> no ineffective assistance of counsel in the
> court's rejection of the plea offer presented to
> it. As the Court noted to counsel below, any
> plea which had lacked accountability for the
> McClain homicide would have been rejected
> by the Court.

*State v. Hedlund*, No. CR 1991-090926, Minute Entry at 3–4 (Ariz. Super. Ct. June 1, 2001) (emphasis added). This ruling is an unreasonable application of clearly established Supreme Court precedent.

Contrary to the state PCR court's statement, a hearing was *not* conducted by the trial court on either the issue of ineffective assistance of counsel or the plea negotiations and second plea agreement. There was, however, a hearing on the motions for recusal and for change of judge. By incorrectly stating that the hearing regarding the motion to recuse Judge Sheldon was a hearing on the ineffective assistance claim, the state PCR court applied the correct law to the wrong facts. Based on the recusal hearing, the state PCR court concluded that defense counsel "properly, aggressively and professionally pursued the issue." But defense counsel's efforts to transfer Hedlund's case to another judge were irrelevant to evaluating whether counsel performed deficiently by abandoning the second plea agreement.

Also, even if the state PCR court had applied *Strickland* to the correct facts, its conclusion that Hedlund's trial counsel's performance was not constitutionally deficient was unreasonable. To prove ineffective assistance during the plea phase of a prosecution, Hedlund "must demonstrate gross error on the part of counsel." *Turner v. Calderon*, 281 F.3d

851, 880 (2002) (quoting *McMann v. Richardson*, 397 U.S. 759, 772 (1970)). Hedlund's trial counsel committed gross error when he allowed the second offer of a plea agreement, which would have saved Hedlund from the death penalty, to expire even though Hedlund had told him he was willing to accept the plea. The majority's cursory dismissal of this issue and focus on trial counsel's "tactical" decision to move for a recusal are misguided.

The majority, like the state PCR court, misreads the record. The majority concludes that the record is unclear as to whether a second plea offer was still on the table on Thursday, October 8—the date that defense counsel first asked Judge Sheldon to recuse himself and allowed the court's plea deadline to expire. Because of this purported lack of clarity, the majority dismisses Hedlund's contention that the second plea offer was still available and that his counsel's decision to let the second plea offer expire and expose Hedlund to the death penalty was ineffective assistance. The record does reflect that on Tuesday, October 13, when the parties were arguing defense counsel's motion to recuse, the prosecutor said, "There is no plea offer to Mr. Hedlund as of today. . . . We were talking Tuesday afternoon [October 6] and [defense counsel] advised me that Mr. Hedlund turned down the latest offer which is in his pleading today. I said, fine. If we don't plead something by Friday, that is it." Evidentiary Hr'g Tr. at 56–57, Oct. 13, 1992. But it is wrong to conclude from this statement alone that the second plea agreement had been unconditionally rejected by the time defense counsel moved to recuse Judge Sheldon.

When he moved to recuse Judge Sheldon, defense counsel had a plea offer in hand that would have saved Hedlund from

the death penalty.**⁸**  The record, however, is ambiguous as to whether the "latest offer" the prosecutor referred to during the recusal hearing was the second plea offer or a different offer. At other times during the hearing, the prosecutor, Judge Sheldon, and Judge Sheldon's assistant each said that they believed the parties were going to come in on Thursday, October 8 to discuss the latest plea agreement with the judge. Thus, it is unlikely that the "latest plea" had been rejected on Tuesday, October 6 if the parties, as of Wednesday, were planning to meet with Judge Sheldon to discuss that very plea proffer.  Also, as of October 9, defense counsel stated in his motion to recuse Judge Sheldon that "Hedlund and the State have come to a [sic] agreement which is within the range suggested by the court."  Lastly, on the same day that defense counsel told the prosecutor that the "latest offer" had been rejected, the parties phoned the court to clarify what would be a more appropriate plea.  The parties were supposed to come in on Thursday, October 8 to further discuss the second plea agreement with Judge Sheldon.  Defense counsel's failure to accept the proposed second plea offer, or, at the very least, meet with Judge Sheldon and the prosecutor to further discuss the offer on October 9 as they had agreed, was deficient performance.  To conclude otherwise is an unreasonable application of *Strickland*.

The test for deficient performance is "whether counsel's assistance was reasonable considering all the circumstances."

---

**⁸** The record is not ambiguous as to whether Hedlund had an offer in hand when his attorney moved to recuse Judge Sheldon.  While insisting that the record is unclear, the majority accepts that defense counsel had an offer in hand to justify its conclusion that defense counsel's actions were strategic.  Therefore, there is no explanation, whether reasonable or not, that supports defense counsel's abandonment of plea negotiations.

*Strickland*, 466 U.S. at 688. Contrary to the majority's position, defense counsel's tactical decision to move for recusal does not excuse his abandonment of the second plea offer negotiations.[9] Defense counsel knew that Hedlund's primary goal in pleading guilty to lesser charges was to avoid a capital sentence, yet when presented with a plea that would have resulted in a sentence of a term of years, defense counsel irresponsibly shifted all of his efforts to the recusal motion and allowed the second plea offer to expire. The majority portrays the decision to abandon the plea negotiations and pursue the recusal motion as one strategic choice subject to the doubly-deferential standard under *Strickland* and AEDPA. But the majority provides no reason as to why it was strategic for Hedlund's counsel to drop one and pursue the other, rather than pursue both concurrently. The record contains no articulable reason as to why abandoning the plea negotiations, after Hedlund told counsel he was willing to accept the latest offer, was strategic.

The majority's explanation is unconvincing. If defense counsel strategically ended plea negotiations in Judge Sheldon's court, why did he cease all negotiations with Judge Sheldon *and* the prosecutor, thus allowing the offer—which according to the majority he sought to preserve—to expire?

---

[9] While counsel's motion to have Hedlund's case moved before a different judge was a tactical decision, his failure to timely respond to the prosecutor's second plea offer was not. Counsel's decision to bring a recusal motion is not at issue here. Thus, the majority's thorough analysis of why counsel's decision to move for recusal was within the "wide range of reasonable professional assistance" is off point. *Strickland*, 466 U.S. at 689. The relevant inquiry, instead, is whether defense counsel's abandonment of ongoing plea negotiations with the prosecutor and the judge, when a second plea agreement was nearly complete, constituted deficient performance.

The only explanation is error, amounting to deficient performance. Defense counsel's failure to attend the plea discussions with the prosecutor scheduled before Judge Sheldon suggests that negligence, rather than strategy, was at play. Defense counsel's failures were especially egregious because trial was to begin only a few days later and the chances of another plea offer were slim to nil.

"During all critical stages of a prosecution, which must include the plea bargaining process, it is counsel's 'dut[y] to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution.'" *Nunes v. Mueller*, 350 F.3d 1045, 1053 (9th Cir. 2003) (quoting *Strickland*, 466 U.S. at 688). It is unknown if Hedlund knew that defense counsel had abandoned the plea bargaining process in favor of trying to recuse Judge Sheldon. By abandoning plea negotiations merely as a consequence of pursuing the recusal motion, and not as the result of an informed and separate decision, defense counsel failed to provide constitutionally effective counsel to Hedlund.

The state PCR court's conclusion that Hedlund did not suffer prejudice because "any plea which had lacked accountability for the McClain homicide would have been rejected by the Court," was also an unreasonable application

of established Supreme Court precedent.[10] To succeed on his ineffective assistance claim, Hedlund must also show that:

> but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Lafler*, 132 S. Ct. at 1385. "[I]t is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." *Missouri v. Frye*, 132 S. Ct. 1399, 1409 (2012). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If the second plea offer had been accepted, Hedlund would have been sentenced to a term of years and avoided the death penalty. The majority's explanation to support its view that Judge

---

[10] The state PCR court's decision was also contrary to Arizona law because "a petitioner is not required to prove that the trial court would have accepted the plea agreement in order to establish prejudice resulting from counsel's deficient advice." *State v. Donald*, 10 P.3d 1193, 1202 (Ariz. Ct. App. 2000) (holding that "such a requirement 'presents inherent problems of proof,' and that it would be 'unfair and unwise to require litigants to speculate as to how a particular judge would have acted under particular circumstances'") (citations omitted).

Sheldon would not have accepted the second plea agreement is flawed.[11]

First, the majority concludes that it is doubtful whether Judge Sheldon would have found that the second plea agreement "provided sufficient accountability for the McClain homicide." But the excerpts from the hearing on defense counsel's motion to recuse that the majority cites do not support this conclusion. Instead, they demonstrate Judge Sheldon's concern regarding a second-degree murder charge under the felony murder rule. In the first plea offer, Hedlund would plead to second-degree murder for the homicide of Mertens, not McClain. Judge Sheldon's concern with the second-degree murder plea was not related to Hedlund's culpability in the McClain homicide. Instead, he was concerned with the legal feasibility of Hedlund pleading guilty to second-degree murder under Arizona's felony murder rule. *See* Ariz. Rev. Stat. § 13-1105(A)(2). Judge Sheldon was "very surprised" by the first plea agreement because he had doubts that the parties would be able "to establish a factual basis for Second Degree Murder to a Felony Murder charge . . . [considering that] there are no

---

[11] The majority also relies on arguments not found in the state PCR court's decision to conclude that counsel's performance was not deficient. Although we are required to evaluate *all* reasonable arguments that a state court *could have* relied upon when assessing a state high court's summary denial of original habeas petitions, *see Richter*, 131 S. Ct. at 784, we should not evaluate such hypothetical arguments when assessing a state court's denial of a habeas petition that *actually relied* on a lower court's reasoning. Instead, we "must 'look through' that judgment to the last reasoned state-court decision on the merits." *Cannedy v. Adams*, 706 F.3d 1148, 1157 (9th Cir. 2013). Thus, we should look only to the state PCR court's actual reasoning to determine whether it was an unreasonable application of clearly established Supreme Court case law.

lesser included offenses to Felony Murder." Evidentiary Hr'g Tr. at 37–38, Oct. 13, 1992. If the second plea agreement had been presented to the court, however, there is a reasonable probability that Judge Sheldon would have accepted it even with the second-degree murder charge for the Mertens homicide. In fact, Judge Sheldon sentenced Hedlund based, in part, on a second-degree murder conviction under Arizona law. Thus, because the facts permitted the jury to convict Hedlund of second-degree murder, Judge Sheldon's concern over the legal feasibility of the felony murder rule would not have barred his approval of the second plea agreement.

Second, the record shows that any accountability concerns that Judge Sheldon had regarding Hedlund's culpability in the McClain homicide would have been likely addressed with the addition of the burglary charge in the second plea offer. Although Judge Sheldon had "not made up [his] own mind," at the time of the recusal hearing as to whether burglary would be sufficient to address his culpability concerns, he did "believe[] at the very least, what [counsel] should be looking at would be Burglary in the First Degree which would be entry in the home armed with a weapon either as a dangerous offense or non-dangerous." *Id.* at 32. While both sides can speculate about whether the burglary charge would have definitively satisfied Judge Sheldon's accountability concerns, the record contains enough evidence to raise doubt, and undermine confidence, as to whether Hedlund would have received a capital sentence if defense counsel had presented the second plea agreement to the court.

Third, the majority's conclusion that Judge Sheldon's due process concerns would have doomed the second plea agreement is incorrect. Judge Sheldon's concern regarding disparate sentences was a reason that he rejected the *first* plea

agreement, not a reason that he may have rejected the second plea agreement. Unlike the first plea agreement, the second plea agreement included a first-degree burglary charge which, according to petitioner's counsel at oral argument, would have exposed Hedlund to approximately fourteen more years of prison time than the first plea agreement. Also, disparate sentences between McKinney and Hedlund were appropriate as their culpability, in at least the Mertens homicide, differed. In fact, the jury convicted McKinney of first-degree murder, and Hedlund of second-degree murder, for the Mertens homicide.

As to Hedlund's willingness to accept the second plea offer, there is no evidence in the record that Hedlund himself did not want to enter a plea in front of Judge Sheldon. The only evidence of Hedlund's input into defense counsel's decision to abandon the second plea offer and pursue the motion to recuse is that Hedlund "fe[lt] that [the] court ha[d] become biased against him." But Hedlund's feelings about Judge Sheldon were insufficient to justify defense counsel's decision to abandon the plea negotiations altogether and instead move for recusal.

Finally, the ultimate question is whether there is a "reasonable probability" that Hedlund would have been spared the death penalty had defense counsel presented the second plea agreement to Judge Sheldon. *See Strickland*, 466 U.S. at 694. Speculating about whether Judge Sheldon would have accepted the second plea agreement is an intermediate step. And in truth, speculating about whether Judge Sheldon would have accepted the second plea agreement is just that: speculation. At the time of the recusal hearing, even Judge Sheldon admitted that he "had not made up [his] own mind whether or not that [the burglary charge]

would be an appropriate disposition." Evidentiary Hr'g Tr. at 32, Oct. 13, 1992. What is known is that Judge Sheldon was not committed to sentencing Hedlund to death, and was open to the State pursuing a term of years instead of a death sentence. When presented with the first plea agreement, he "was very surprised there had not been a plea to First Degree Murder with the State stipulating it would not seek the death penalty." *Id.* at 37. Thus, there is a reasonable probability that if Judge Sheldon had been presented with a plea agreement that satisfied his other concerns and did not include the possibility of a capital sentence, he would have accepted it.

## V.

The last reasoned state court decision on Hedlund's shackling claim is the Arizona Supreme Court's decision on direct appeal. *See McKinney*, 917 P.2d at 1223. Because that decision is both "contrary to . . . clearly established Federal law," 28 U.S.C. § 2254(d)(1), and "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* at § 2254(d)(2), we "must then resolve the claim without the deference AEDPA otherwise requires," *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007); *accord Frantz v. Hazey*, 533 F.3d 724, 735–37 (9th Cir. 2008) (en banc).

## A.

The trial court decided to shackle Hedlund before it even heard testimony about a possible flight risk. Then, to "put [the] matter on the record," the trial court heard testimony from Deputy Sheriff Jack Roger Lane, who said that an inmate told a subordinate officer that he had overheard James

McKinney and another prisoner who was charged with murder discussing an escape plan. The inmate could not identify McKinney's co-plotter. Deputy Sheriff Lane testified that Hedlund's jail card contained a narrative about the escape plan, which read, "Warning, take keys and clothing per class A1920. McKinney planning escape by jumping guard per information, 300120, Per request CPD 2525." Deputy Sheriff Lane had asked that the information about McKinney's escape attempt be placed on Hedlund's jail card. This is the only record evidence that Hedlund was an escape risk.

Under AEDPA, a challenge to a state court's factual determination may be based on "the claim that the finding is unsupported by sufficient evidence, that the process employed by the state court is defective, or that no finding was made by the state court at all." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004) (citations omitted). "[W]e must more than merely doubt whether the process operated properly. Rather, we must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." *Id*. at 1000. While this "is a daunting standard . . . [it] is not impossible to meet." *Id*.

The Arizona Supreme Court rejected Hedlund's shackling claim because "the trial judge specifically made a record to document his security concerns: Hedlund attempted an escape during the summer of 1991 and also made plans with another capital defendant to escape by attacking a guard and taking his uniform and gun." *McKinney*, 917 P.2d at 1223. But it was McKinney, not Hedlund, who attempted to escape in 1991. And it was McKinney, not Hedlund, who had been overheard making an escape *plan* in 1992. Therefore, the

Arizona Supreme Court's factual determination as to Hedlund was not only incorrect, it was an unreasonable determination given that the only fact possibly supporting the notion that Hedlund was a security risk was the jailhouse informant's hearsay statement that McKinney was planning to escape with another capital defendant. But none of the state's witnesses knew the identity of McKinney's co-plotter. By misattributing McKinney's 1991 escape attempt to Hedlund, the trial court unreasonably inferred that Hedlund's past attempt made it probable that he was planning another escape with McKinney. Absent incorrectly believing that Hedlund had tried to escape in 1991, the Arizona Supreme Court gave no indication that it would have reached the same result, and thus the finding that Hedlund was a security risk was "unsupported by sufficient evidence," *Taylor*, 366 F.3d at 999.

Moreover, the Arizona Supreme Court did not just err as to the 1991 escape attempt. When discussing the 1992 escape plan, it again erroneously attributed evidence against McKinney to Hedlund. It said that the trial judge's assessment of Hedlund's security threat was supported because Hedlund had made plans with another capital defendant to escape. But the only evidence of an escape plan was from Deputy Sheriff Lane, who said that McKinney, known by name to the inmate who overheard the plot, made escape plans with another defendant charged with murder, whose name the inmate did not know. While the inference that the other defendant was Hedlund may or may not be permissible, the Arizona Supreme Court did not make that inference. Instead, it erroneously attributed the exact record evidence of McKinney's flight risk to Hedlund, resulting in an unreasonable determination of fact to support its

conclusion that the trial court had well-founded security concerns as to Hedlund.

The Arizona Supreme Court did not make a finding that Hedlund was McKinney's unnamed co-plotter. But even if it had, that finding would also be an unreasonable determination of fact. The *only* evidence that Hedlund was involved in the 1992 plan is that he was charged with murder (thus fitting the description of the inmate with whom McKinney allegedly spoke) and had McKinney's escape plan denoted on his jail card. The majority places great weight on the jail's "security-based decision" to identify Hedlund as a threat on his jail card. However, Deputy Sheriff Lane testified that *he* asked that information about McKinney's 1992 plot be placed on Hedlund's jail card. Thus, the jail card reflected nothing more than Deputy Sheriff Lane's opinion that McKinney's co-plotter was likely Hedlund. But Deputy Sheriff Lane's testimony demonstrates that the only basis for his opinion was the third-hand information that McKinney had plotted with another defendant charged with murder. Deputy Sheriff Lane's "opinion," then, was nothing more than a hunch. And hunches should not justify the use of highly prejudicial restraints during trial. *Cf. Gonzalez v. Pliler*, 341 F.3d 897, 902 (9th Cir. 2003) ("[W]hen the imposition of restraints is to be based upon conduct of the defendant that occurred outside the presence of the court, sufficient evidence of that conduct must be presented on the record so that the court may make its own determination of the nature and seriousness of the conduct and whether there is a manifest need for such restraints; the court may not simply rely upon the judgment of law enforcement or court security officers or the unsubstantiated comments of others.") (quoting *People v. Mar*, 52 P.3d 95, 107 (Cal. 2002)). Without the misattributed 1991 escape attempt and 1992

escape plot, the trial court's only basis for shackling Hedlund in view of the jury was Deputy Sheriff Lane's speculation that Hedlund was McKinney's co-plotter, which itself was based on an inmate's recollection of what he overheard.

In the absence of *any individualized evidence* tying Hedlund to McKinney's 1992 escape plot, the Arizona Supreme Court's factual determination that Hedlund was involved in the 1992 plot was unreasonable.

**B.**

It was clearly established by 1996, when the Arizona Supreme Court issued its decision rejecting Hedlund's shackling claim, that shackling a criminal defendant during his jury trial is "the sort of inherently prejudicial practice that . . . should be permitted only where justified by an essential state interest specific to each trial." *Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986). Indeed, "no person should be tried while shackled and gagged except as a *last* resort." *Illinois v. Allen*, 397 U.S. 337, 344 (1970) (emphasis added); *see Wilson v. McCarthy*, 770 F.2d 1482, 1484–85 (9th Cir. 1985) ("Shackling may be justified as a last resort, in cases of extreme need, or in cases urgently demanding that action.") (citations and internal quotation marks omitted). The Arizona Supreme Court's rejection of Hedlund's shackling claim was an unreasonable application of clearly established Supreme Court case law in two ways.

First, even if we assume that the trial court had an "essential state interest" in courtroom security, *Holbrook*, 475 U.S. at 569, shackling Hedlund in view of the jury was not possibly "the fairest and most reasonable way," *Allen*, 397 U.S. at 344, to alleviate that concern. Although the trial

judge replaced the original table, behind which Hedlund and McKinney sat shackled, with a table that covered a greater portion of their legs, he unreasonably refused defense counsel's request that a curtain or other barrier be placed around the table so that the jury could not see the shackles. As a result, the jury saw Hedlund shackled and the trial court failed in its duty to "carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." *Estelle v. Williams*, 425 U.S. 501, 503 (1976).**[12]**

Second, it was an unreasonable application of clearly established federal law to conclude that the trial court had sufficient individualized evidence to support shackling Hedlund. Because the Arizona Supreme Court's legal analysis of this claim was dependent on an antecedent unreasonable factual determination, we "must then resolve the claim without the deference AEDPA otherwise requires." *Panetti*, 551 U.S. at 953. Thus, the Arizona Supreme Court's decision is an unreasonable application of clearly established Supreme Court case law if, after correcting the unreasonable factual determinations, Hedlund's shackling was constitutionally impermissible. Without misattributing McKinney's 1991 escape attempt and Deputy Sheriff Lane's testimony describing McKinney's 1992 escape plot to Hedlund, the only individualized analysis supporting "the judge's well-founded security concerns" is Deputy Sheriff Lane's speculation that Hedlund was McKinney's co-plotter

---

**[12]** The majority insinuates that it was Hedlund's fault that the jurors saw the shackles. But Hedlund's constitutional right to a fair trial rests in the Fourteenth Amendment, which the courts, not Hedlund, are required to protect. *Estelle*, 425 U.S. at 503. Therefore, Hedlund's efforts, or alleged lack thereof, to keep his restraints concealed are irrelevant.

in the 1992 escape plan. If the safeguards embodied in *Allen*, *Estelle*, and *Holbrook* mean anything, they must require more than a single security officer's hunch to justify the highly prejudicial act of shackling a criminal defendant in view of the jury charged with determining his guilt.

Even if it was not unreasonable for the trial court to infer that Hedlund was McKinney's co-plotter, it was an unreasonable application of Supreme Court precedent to shackle Hedlund in view of the jury solely because another inmate may have overheard Hedlund discussing the possibility of escape. To support its conclusion that the trial court was justified in shackling Hedlund, the majority cites *Hamilton v. Vasquez*, 882 F.2d 1469 (9th Cir. 1989), and *Crittenden v. Ayers*, 624 F.3d 943 (9th Cir. 2010). But these cases actually support Hedlund's position. In *Hamilton*, we did not address whether "the threat of violence or disturbance was serious enough to justify the shackling of Hamilton throughout his lengthy trial." 882 F.2d at 1473. However, we did emphasize that "[s]hackling is proper where there is a *serious* threat of escape or danger."[13] *Id.* at 1471 (emphasis added). In quoting the same language, the majority ignores

---

[13] The two decisions that we relied on in *Hamilton* involved much graver threats of violence and escape. *See Loux v. United States*, 389 F.2d 911, 919 (9th Cir. 1968) (holding that shackling defendants is permissible where one of the defendants had twice successfully escaped from prison and lost an arm in an unsuccessful attempt, another had escaped from prison five times, and the third defendant had escaped from prison three times and was then serving a sentence for second-degree murder); *see also Stewart v. Corbin*, 850 F.2d 492, 497–98 (9th Cir. 1988) (holding that shackling defendant is permissible where defendant had a prior felony conviction for escape while in police custody, had an outstanding arrest warrant for another escape in custody, had physically assaulted officers in the courtroom, and had threatened a judge and an attorney).

the directive that the threat of escape or danger must be "serious" and fails to analyze this with respect to Hedlund. In *Crittenden*, shackling the defendant during trial was justified because the defendant had already once escaped from jail, kidnapping a man and commandeering his truck in the process, and twice attempted to escape, assaulting a prison guard during one of the attempts. 624 F.3d at 948. Furthermore, even with this "state interest specific to Crittenden's trial," the trial court in that case allowed shackles and handcuffs only outside the presence of the jury. *Id.* at 971. Thus, not only was the state's interest in preventing Crittenden's escape buttressed by much stronger evidence than that in Hedlund's case, but the means used to protect that interest were much less likely to infringe Crittenden's constitutional right to a fair trial.

Here, by forcing Hedlund to wear visible leg braces during his trial, the trial judge jeopardized the "principle that there is a presumption of innocence in favor of the accused . . . axiomatic and elementary, and [whose] enforcement lies at the foundation of the administration of our criminal law." *Coffin v. United States*, 156 U.S. 432, 453 (1895); *see Spain v. Rushen*, 883 F.2d 712, 721 (9th Cir. 1989). And he threatened Hedlund's most fundamental right solely because Deputy Sheriff Lane had a hunch that Hedlund was the unidentified co-plotter in McKinney's escape plan. In other words, the trial judge decided that one security officer's suspicion of Hedlund's involvement in McKinney's escape plot, based wholly on a conversation that was relayed to that security officer via another inmate and a subordinate officer, was sufficient to extinguish Hedlund's right to a fair trial. This was an egregious constitutional error that more than satisfies AEDPA's stringent demands.

## C.

Even if Hedlund was unconstitutionally restrained, the violation must have had a "substantial and injurious effect or influence" on the verdict to warrant habeas relief. *Brecht*, 507 U.S. at 623 (internal quotation marks omitted). We evaluate the effect keeping in mind that "in cases of grave doubt as to harmlessness the petitioner must win." *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995). "To determine whether the imposition of physical restraints constitutes prejudicial error, we have considered the appearance and visibility of the restraining device, the nature of the crime with which the defendant was charged and the strength of the state's evidence against the defendant." *Larson v. Palmateer*, 515 F.3d 1057, 1064 (9th Cir. 2008). Fundamentally, we ask "whether what [the jurors] saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial." *Holbrook*, 475 U.S. at 572.

Hedlund was prejudiced when he was shackled in view of the jury. Here, as in *Rhoden v. Rowland*, 172 F.3d 633 (9th Cir. 1999), "the unjustified shackles were not obtrusive, but were visible and actually seen by some of the jurors," supporting a finding of prejudice. *Id*. at 637. In *Dyas v. Poole*, 317 F.3d 934 (9th Cir. 2003) (per curiam), we noted that "shackling during trial carries a high risk of prejudice because it indicates that the court believes there is a 'need to separate the defendant from the community at large, creating an inherent danger that a jury may form the impression that the defendant is dangerous or untrustworthy.'" *Id*. at 937 (quoting *Rhoden*, 172 F.3d at 636). Prejudice was "particularly likely" in *Dyas* because at least one juror saw the petitioner's leg restraints, which were unobtrusive enough that the trial judge had thought they would not have been very

visible to jurors. *Id.* at 936–37. Here, Hedlund's restraints were visible to jurors throughout the trial. And even though the trial judge allowed Hedlund to sit in front of a table that partially covered his legs, the restraints were still visible. Their visibility supports a finding of prejudice. *See Holbrook*, 475 U.S. at 568–69; *Dyas*, 317 F.3d at 937; *Rhoden*, 172 F.3d at 637.

The nature of the criminal charges filed against Hedlund also suggests prejudicial error. When "the defendant is charged with a violent crime . . . shackling essentially brands him as having a violent nature." *Larson*, 515 F.3d at 1064 (internal alterations and quotation marks omitted). Hedlund was charged with the murders of Mertens and McClain, both violent crimes. Thus, shackling Hedlund was especially prejudicial because it risked causing the jury to infer that Hedlund was a dangerous man with a propensity to act violently.

Lastly, because the state's evidence against Hedlund was not overwhelming, the risk that shackling Hedlund prejudiced the jury is real. In *Rhoden*:

> the basic issue at his trial concerned whether there was consent or whether Rhoden used force or fear to overcome his accuser's will. The evidence on this issue was disputed and the jurors deliberated for over nine hours over three days, which suggests that they did not find the case to be clear-cut.

172 F.3d at 637. Evidence of Hedlund's *involvement* in the crimes may be "overwhelming." *Cox v. Ayers*, 613 F.3d 883, 891 (9th Cir. 2010) (quoting *Dyas*, 317 F.3d at 937).

However, as in *Rhoden*, one of the critical issues at trial, Hedlund's mental state, was hotly disputed. Hedlund's defense theory was that McKinney was the mastermind and that Hedlund was a reluctant participant. While the jury ultimately convicted Hedlund of the first-degree murder of McClain and the second-degree murder of Mertens, the evidence supporting Hedlund's first-degree murder conviction was not overwhelming. Because the jury convicted McKinney of first-degree murder for the deaths of both Mertens and McClain, it is reasonable to conclude that the jury found McKinney more culpable than Hedlund. Thus, on the crucial issue of whether Hedlund's culpability warranted a first-degree murder conviction, which triggered a possible death sentence, visibly shackling him prejudiced the jury against him.

Because the restraints were visible, because this case involves violent crimes, and because the evidence of Hedlund's mental state was disputed and not overwhelming on the critical issue that would trigger a death sentence, the trial court's error substantially influenced the jury's verdict and warrants habeas relief. *See Rhoden*, 172 F.3d at 637.

* * *

"Because sentences of death are qualitatively different from prison sentences," the U.S. Supreme Court has gone to "extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake." *Eddings*, 455 U.S. at 117–18 (O'Connor, J., concurring) (citations and internal quotation marks omitted). The process used to try, convict, and sentence Hedlund to death was

unconstitutional because it increased, rather than decreased, the chances that Hedlund was sentenced to death out of "whim, passion, prejudice, or mistake." *Id.* The Arizona courts unreasonably concluded otherwise. Even under the Supreme Court's restrictive interpretation of AEDPA provisions, such constitutional violations entitle Hedlund to habeas relief.